UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ALTERNATIVE MEDICINE | ) | |
| AND PHARMACY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:14 CV 1469 CDP |
| | ) | |
| EXPRESS SCRIPTS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before me on plaintiff's motion for preliminary injunction.

Plaintiff Alternative Medicine and Pharmacy, Inc., d/b/a Omniplus Pharmacy

(Omniplus) brought this suit against defendants Express Scripts, Inc., and Medco

Health Services, Inc. (collectively referred to here as Express Scripts). Omniplus,

who is currently part of Express Scripts' provider network, sued after Express

Scripts sent notice that it was terminating their contract for cause. Express

Script's stated reason for the termination was that Omniplus had misrepresented

that it did not waive co-payments. Omniplus contends that it does not waive co-

payments, and argues that if Express Scripts is allowed to terminate the contract it

will put Omniplus out of business. I will deny the motion for preliminary

injunction for the reasons that follow.

# Background Facts[1]

OmniPlus is a community and compounding pharmacy with a mail order business.[2]  Express Scripts is a pharmacy benefits manager.[3]  OmniPlus has a contract (Provider Agreement) with Express Scripts to provide pharmacy services to members of health plans managed by Express Scripts.  The parties' relationship is also governed by a Provider Manual.  Approximately 25 percent of OmniPlus' patients are managed by Express Scripts, and those patients represent about 51 percent of its revenue.

On July 31, 2014, Express Scripts sent a letter to OmniPlus terminating its membership in Express Scripts' pharmacy network effective September 1, 2014, alleging contractual violations and asserting a termination for cause.  OmniPlus disputed the termination with Express Scripts and then filed suit in this Court on August 25, 2014, alleging breach of the Provider Agreement and violation of Texas law.  OmniPlus sought a temporary restraining order and a preliminary

---

[1] The facts are set out in this Memorandum and Order for purposes of deciding the preliminary injunction motion only, and this Memorandum and Order does not relieve any party of the burden of proving any facts in support of its claims or defenses on summary judgment or at trial and may not be relied upon for that purpose.

[2] Compounding pharmacies have the ability to mix multiple drugs or active ingredients to create a medication specifically tailored to a patient's needs.  OmniPlus' compounding business is almost exclusively mail order.

[3] Pharmacy benefit managers manage and attempt to reduce pharmacy reimbursement expenses for member claims on behalf of health plan administrators and third-party payors such as insurance companies, employers, and health maintenance organizations. Express Scripts is the largest pharmacy benefit manager in the United States.  Express Scripts also competes with OmniPlus directly in the mail-order pharmacy business.

injunction preventing its termination from the Express Scripts' pharmacy network. After the parties entered into a stipulation agreeing that Express Scripts would not terminate OmniPlus' Provider Agreement pending the resolution of the preliminary injunction motion, I denied the motion for temporary restraining order. The parties conducted limited discovery and the preliminary injunction hearing was held on September 25, 2014. At the hearing OmniPlus offered one witness, Scott Breimeister, who has worked for the company for nine months and became President at the end of August. Express Scripts also offered one witness, John Gavin, who is a Senior Manager with Express Scripts' fraud, waste, and abuse team and participated in the decision to terminate OmniPlus.

Section 2.4 of the Provider Agreement[4] states that OmniPlus "shall collect from Members . . . the applicable Copayment indicated by [Express Scripts]" and further provides that "[c]opayments may not be waived or discounted . . . ." [Doc. #38-1 at 3]. The Provider Manual[5] explains what will happen to OmniPlus if it fails to collect co-payments:

---

[4] All of the documents discussed herein were also introduced as exhibits at the preliminary injunction hearing. For ease of reference, I will cite to those documents as they can be found in the Court file unless they are not in the record. In those cases I will refer to the exhibit designations from the hearing.

[5] In the version of the Provider Manual attached as sealed Exhibit B to Express Scripts' trial brief [Doc. #38], this Section appears as 2.3. However, in an updated version of the Provider Manual, which was attached to Express Scripts' memorandum in opposition to the renewed motion for temporary restraining order, this Section appears as 2.2. [Doc. #25-2 at 6]. For convenience, I will hereafter refer to the Section as 2.3.

Network Provider may not institute Member copayment discount program or otherwise alter a Member Copayment, unless such waiver or discount is required by law. If [Express Scripts] becomes aware of any copayment or cost-sharing discounts being offered by Network Provider – either through audit, investigation, Member statements , or review of Network Provider's website or other advertising materials – Network Provider may be subject to immediate termination. For clarification, if [Express Scripts] identifies fliers, advertisements, or other statements from Network Provider suggesting that copayments will be a flat fee or that copayments will be discounted, capped, or waived will result in termination of Network Provider.

The Provider Agreement provides Express Scripts with an immediate right to terminate OmniPlus from the provider network in the event that:

1. OmniPlus "fails to comply with [Express Scripts'] policies and procedures, including, but not limited to, the Provider Manual";

2. OmniPlus "fails to comply . . . with Section 2.4 of this Agreement [dealing with copayments]; or

3. OmniPlus "no longer meets credentialing requirements."

[Doc. #38-1 at 4]. The Provider Manual contains a similar provision, except it also includes a right to immediate termination upon notice if "any representation to [Express Scripts] or any response to a question set forth on the Provider Certification is untrue or becomes untrue," or if OmniPlus "breaches any of its representations and warranties set forth in this Agreement or any other document provided to OmniPlus." [Doc. #25-2 at 4]. Section 4.2 of the Provider Agreement

permits Express Scripts to terminate OmniPlus without cause upon 90 days written notice.[6]

The Provider Manual also includes a Texas-specific addendum. Section 5 of the addendum provides in relevant part as follows:

> 5.1 [Express Scripts] shall provide a written explanation to [OmniPlus] of the reason(s) for termination at least ninety (90) days prior to the effective date of such termination to the extent required by law. On request . . . and before the effective date of the termination, and within at most sixty (60) days of request, [OmniPlus] shall be entitled to such review and formal, though non-binding, recommendation from [Express Scripts] in accordance with, and to the extent required by, 28 T.A.C. 3.3703(a)(19), except . . . in a case of fraud or malfeasance.
>
> 5.2 Any notice of termination by [Express Scripts] shall include [OmniPlus'] right to request, within thirty (30) days of receipt of the termination notice, a review by insurer in accordance with, and to the extent required by 28 T.A.C. § 3.3706(h), 3.9204(g), Tex. Admin. Code 843.307.

[Doc. #1-3 at 1].

Threshold credentialing is required for membership in Express Scripts' pharmacy provider network, as is periodic re-credentialing. The credentialing process relies, in part, on Provider Certifications, which must be completed by would-be and existing pharmacy provider network members. Provider Certifications include questions concerning the type of services a pharmacy offers, pharmacist discipline, and general pharmacy business practices. By submitting a

---

[6] The Provider Agreement actually says "30 days . . . or longer . . . as may be required by law," but Express Scripts concedes for purposes of this motion that the Texas-specific Addendum would appear to require 90 days written notice of a termination without cause.

Provider Certification, a pharmacy such as OmniPlus certifies that the information provided is "true and correct" and agrees to "notify Express Scripts immediately in writing" if any part of the certification becomes "untrue or inaccurate." A pharmacy also agrees that the failure to notify Express Scripts of any change in its Provider Certification "will be considered a breach of my Provider Agreement and could result in disciplinary action including, but not limited to, immediate termination of my Provider Agreement."

In the spring of this year Express Scripts required OmniPlus to complete a Provider Certification form, which OmniPlus submitted on March 4, 2014. Question # 29 asked whether "you or your pharmacy(ies) ever waive or offer a reduction of member copayments"? OmniPlus answered, "No." Mr. Gavin testified that this was the first time that OmniPlus had ever been asked this question, which was one of several additional questions that were submitted to all compounding pharmacies. A complete copy of the Provider Certification was introduced at the hearing as defendants' Exhibit G. In this document, OmniPlus also certified that 98 % of its business was "open door retail/community," while only two percent was mail order. OmniPlus also stated that five percent of its business was in compounding. In contrast, Mr. Breimeister testified that the mail order and compounding businesses were essentially the same, and were a "significant" part of OmniPlus's business.

After receiving the certification form, Express Scripts contacted some members who used OmniPlus' mail-order delivery service and asked these members whether they had paid the required co-payments for these prescriptions. One member told Express Scripts that he was informed by OmniPlus that OmniPlus "would send an invoice but wouldn't try to collect," so that member did not fill his prescription with OmniPlus. Three other members filled prescriptions using OmniPlus' mail-order pharmacy in March, but had not received bills for their co-payments as of May 29, 2014.[7] Based on this information, Express Scripts notified OmniPlus that it was being terminated for cause for failing to collect member co-payments.

In response to the termination notice, OmniPlus protested that it collected member co-payments and sought internal review of the termination decision under Texas law, which OmniPlus insists applies on its own terms and because it is incorporated into the parties' agreement by virtue of a Texas-specific addendum to the Provider Agreement. Express Scripts declined to provide any internal review process.

At the preliminary injunction hearing, OmniPlus argued that it has never waived copayments for Express Scripts' members and that it collects copayments in accordance with their Provider Agreement. It introduced an exhibit containing a

---

[7] Express Scripts discovered five more instances of OmniPlus' failure to collect co-payments for prescriptions invoiced between May 2, 2014 and July 25, 2014.

number of screen shots from its computer system showing that customers had paid co-payments. Plf. Exh. 14. Express Scripts, on the other hand, introduced account statements showing Express Scripts patients who had been invoiced for copayments in the thousands of dollars, yet had failed to pay any portion of the copayments even though the original invoices had been issued several months ago. Deft. Exh. A2, B2, C2, D2. Mr. Breimeister testified that the OmniPlus documents "show we invoice and attempt to collect on every prescription we fill."

The parties also dispute the meaning of two documents produced by OmniPlus during discovery. Express Scripts contends they show that OmniPlus waives co-pays, and OmniPlus contends they show the opposite. One is a written policy and procedure for co-pay collection dated July 31, 2014. Deft. Exh. W. With regard to commercial insurance patients, it states that OmniPlus invoices patients, but "will work with them and accept any installment payment plan they can afford," and "will not turn them over or report to collection agencies." It then goes on to say people can complete an application for copayment waiver, and sets out the criteria for granting waivers. The other is an October 8, 2013 protocol applicable to patients seeking a particular compounded medication. Plf. Exh. 6. It directs employees to tell patients who ask about co-payments that "per our contract with the insurance companies, we do have to send you an invoice and bill you." It

goes on to direct telling patients that OmniPlus "can never waive a co-payment, which is illegal."

OmniPlus says the waiver provision merely tracks Medicare regulations. Express Scripts argues that the documents show that OmniPlus apparently believed it was only obligated to invoice and bill for co-payments, not to collect them. Mr. Breimeister testified that OmniPlus never waives copayments, but he acknowledged that it makes no effort to pursue unpaid copayments through collection agencies, claiming that it was not company policy and that it did not have the resources to do so. He did not know whether OmniPlus made any other attempts to collect, such as sending follow-up or past due invoices. He could not explain why the various account records introduced into evidence showed all amounts due as "current" and none as past due, even when the invoices were sent months ago and still not paid.

Express Scripts maintains that it can no longer trust OmniPlus and that the relationship between the parties is over.

OmniPlus argues that the loss of membership in Express Scripts' network could put it out of business. In support of that argument, OmniPlus offered the testimony of Mr. Breimeister, who has only been with Express Scripts for nine months and President since last month. Mr. Breimeister claims that OmniPlus would be "out of business in a very short time" if its network membership is

terminated because physicians writing compounding prescriptions "do not have time" to ask patients what their insurance plan is and may therefore find it easier to send all their prescriptions, not just ones for Express Scripts members, to a competing pharmacy. Mr. Breimeister, however, offered no foundation for this testimony and OmniPlus offered no evidence, such as physician affidavits or statements, to support this speculative contention. Mr. Breimeister also did not testify that the mere loss of its Express Scripts' business on its own – without this alleged "added" harm of losing its non-Express Scripts compounding business – would force OmniPlus to close its doors. OmniPlus also offered no evidence regarding its total revenues; Mr. Briemeister said the mail order and compounding business was a "significant" portion of its business, although the form sent in this spring said it was no more than 5% .

## Preliminary Injunction Standard

"The primary function of a preliminary injunction is to preserve the status quo until, upon final hearing, a court may grant full, effective relief." *Kansas City So. Trans. Co., Inc. v. Teamsters Local Union # 41,* 126 F.3d 1059, 1066 (8th Cir. 1997) (citation omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural*

*Res. Def. Council, Inc.,* 555 U.S. 7, 20, 129 S. Ct. 365, 374 (2008).  In the Eighth

Circuit, these four factors are known as the " *Dataphase* " factors, based upon the

1981 en banc case, *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 113 (8th

Cir. 1981).  In each case, the factors must be balanced to determine whether they

tilt toward or away from granting injunctive relief.  *West Pub. Co. v. Mead Data

Cent., Inc.,* 799 F.2d 1219, 1222 (8th Cir. 1986).  The party requesting injunctive

relief bears the "complete burden" of proving that an injunction should be granted.

*Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 418 (8th Cir. 1987).  Injunctive

relief is "an extraordinary remedy that may only be awarded upon a clear showing

that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.

## Discussion

Both sides came up with new arguments at the preliminary injunction

hearing.  Express Scripts argued that OmniPlus is obligated to collect co-payments

under the Provider Agreement, not just invoice for them, and that this constitutes a

further breach of the Provider Agreement justifying termination.  For the first time

at the hearing, Express Scripts argued that the failure to collect a copayment

amounts to a waiver or discount of a copayment.  OmniPlus argued, for the first

time, that despite the language of the Provider Agreement allowing termination for

any reason with appropriate notice, Texas law prevents any termination except for

cause.

At the preliminary injunction stage, OmniPlus must establish a substantial likelihood of prevailing on the merits of its claims. *Planned Parenthood Minn.v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008). As for the first *Dataphase* factor, whether Express Scripts terminated OmniPlus for cause, whether either party breached the Provider Agreement, and whether OmniPlus is entitled to any review procedures or remedies under Texas law are complex and hotly contested factual disputes, and this Court has no way at this juncture to predict which side is likely to prevail at trial. On the breach of contract claim, Express Scripts has come forward with some evidence suggesting that OmniPlus may have at least breached the Provider Agreement and/or Provider Manual by failing to collect some high dollar copayments for compounded medications in its mail-order business. Of course, this is not the precise reason given for termination in the July 31, 2014, termination letter. Whether the failure to collect a copayment amounts to a waiver or discount of a copayment under the parties' agreement and whether Express Scripts may properly rely on the breach of one provision of its agreement to justify termination when it originally relied on another is not clear and cannot be decided on the limited record presented at the preliminary injunction hearing.

For its part, OmniPlus has poked numerous holes in Express Scripts' stated reasons for termination, suggesting that the proffered reasons for termination are baseless and essentially a "moving target" orchestrated to eliminate OmniPlus as a

direct competitor in the mail-order compounding pharmacy business. For example, Mr. Gavin conceded that OmniPlus' alleged waiver policy was consistent with Medicare regulations allowing limited exceptions in cases of extreme financial hardship. OmniPlus also presented evidence that it has never had a request for waiver under this policy. As for the only Express Scripts' member surveyed who actually claimed that he was told by OmniPlus that it "would send an invoice but wouldn't try to collect," that member did not actually fill his prescription with OmniPlus. Mr. Breimeister testified that situation actually occurred frequently with the mail-order compounding business once patients were informed of the amount of the copayment, which could be in the thousands of dollars. OmniPlus argues that this factor demonstrates that they do not waive copayments, and it also points out the protocols for customer service representatives to actually inform members that they do not offer waivers or discounts and are required by law to charge for copayments. The Court cannot predict at this juncture which side will be able to prevail on the breach of contract claim at trial.

OmniPlus has offered far less to demonstrate that it is likely to prevail on the merits of its claim for breach of Texas insurance law. Even if OmniPlus clears the first hurdle of demonstrating that the relied-upon provisions of Texas law apply to Express Scripts, it has offered nothing demonstrating that it has a private right of

action under the statute. The sole case cited by OmniPlus on this issue, *Coll v. Abaco Operating LLC*, 2011 WL 1831748 (E.D. Tex. May 12, 2011), does not stand for the proposition that OmniPlus has a private right of action here. That case does not even deal with insurance law, but instead discusses whether an implied right of action exists for certain provisions of the tax code.

I need not resolve these issues, however, as I find that the motion must be denied because OmniPlus has not demonstrated that it is likely to suffer irreparable injury in the absence of injunctive relief. "The threshold inquiry is whether the movant has shown the threat of irreparable injury." *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.,* 871 F.2d 734, 738 (8th Cir. 1989) (en banc). "The failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction . . . ." *Id.* "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC,* 563 F.3d 312, 319 (8th Cir. 2009). Irreparable harm must be certain and imminent such that there is a clear and present need for equitable relief. *Iowa Utils. Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th Cir. 1996). Possible or speculative harm is not sufficient. *Local Union No. 884, United Rubber, Cork, Linoleum, & Plastic Workers of Am. v. Bridgestone/Firestone, Inc.*, 61 F.3d 1347,

1355 (8th Cir. 1995). When there is an adequate remedy at law, a preliminary injunction is not appropriate. *Modern Computer Sys.*, 871 F.2d at 738.

Here, OmniPlus cannot show that it has no adequate remedy at law given that the Provider Agreement and Manual permit Express Scripts to terminate the agreement without cause upon 90 days written notice. Plaintiff's counsel argued for the first time at the preliminary injunction hearing that the Texas-specific addendum prohibits any termination unless it is for cause. The basis for this argument is § 5.1 of the Addendum, which requires Express Scripts to "provide a written explanation to [OmniPlus] of the reason(s) for termination at least ninety days prior to the effective date of such termination to the extent required by law." According to counsel, a "written explanation" means "for cause." OmniPlus offered no caselaw supporting this theory. OmniPlus has failed to carry its burden of demonstrating any likelihood that it will succeed on the merits of its argument that Express Scripts could not terminate the Provider Agreement with OmniPlus without cause upon 90 days written notice.[8] Even if OmniPlus might otherwise be entitled to injunctive relief, its threat of irreparable harm is severely limited by the fact that OmniPlus is not contractually entitled to network membership lasting beyond 90 days.

---

[8] For example, Express Scripts could provide, as its "written explanation" for the reason for the termination, that it was exercising its right, under § 4.2.a of the Provider Agreement, to terminate without cause.

Like the plaintiff in *Trilogy Health Care, LLC v. Medco Health Solutions, Inc.*, 2013 WL 4832708, *2 (D.N.J. Sept. 10, 2013), a case cited by Express Scripts which is remarkably similar to the one at bar, OmniPlus is seeking injunctive relief to which it has no entitlement under the Provider Agreement. Like the parties in *Trilogy Health*, Express Scripts has also declared that its relationship with OmniPlus is "over." Therefore, under the best case scenario, OmniPlus would be entitled to no more than 90 additional days of membership in Express Scripts' network and a non-binding advisory review process which Express Scripts would remain free to disregard. OmniPlus offers no evidence that continuation in Express Scripts' pharmacy network for some period not to exceed 90 days would be of greater benefit to its business than an award of money damages for lost profits for that same time period.

Instead, OmniPlus only offers vague, conclusory speculation that it will incur "massive financial damage" which "may threaten" to put OmniPlus out of business. OmniPlus offers no supporting evidence for Mr. Breimeister's speculative testimony that physicians may stop using their pharmacy entirely to avoid the hassle of determining whether it remains in Express Scripts' network. Even if true, however, that evidence still fails to meet the threshold of irreparable harm because OmniPlus has represented that only about two percent of its total business is by mail order, and only five percent of the total business is from

compounding, which is the only type of OmniPlus' business conceivably impacted by this alleged harm. Mr. Breimeister provided no foundation for his testimony that the business is "significant," and OmniPlus' retail customers, who apparently comprise 98 % of its business, do not rely on their doctors to "call in" their prescriptions and therefore can continue to bring their prescriptions to OnmiPlus if they so choose.[9] While the loss of Express Scripts' business would undoubtedly be substantial, there is no evidence suggesting that OmniPlus would suffer the kind of financial ruin it alleges in its briefs.

Moreover, OmniPlus' arguments fail to account for the fact that Express Scripts has made clear that, even if OmniPlus gets the review process it seeks, it will terminate the Provider Agreement as soon as the non-binding advisory panel review is complete. Therefore, as the court in *Trilogy Health* found, an injunction lasting 90 days "merely postpones the inevitable" and will not render the business viable for a longer term. *Id.* at *4.

In addition, any alleged harm resulting from OmniPlus' termination in Express Scripts' provider network was contemplated by the parties as it results from the express terms of the Provider Agreement, which permits Express Scripts to terminate OmniPlus' membership even without cause upon 90 days written

---

[9]Although plaintiff's counsel tried to argue that the total percentage of OmniPlus' mail-order and compounding business was much higher, he failed to actually introduce any evidence on this point. The only evidence before me is OmniPlus' verified Provider Certification from March of 2014, and I see no reason not to accept it as true for purposes of deciding this motion.

notice.[10]  As such, it cannot be considered "irreparable."  *See Med-Care Diabetic & Medical Supplies, Inc. v. Strategic Health Alliance, II, Inc.,*2014 WL 325663, *5 (S.D. Ohio Jan. 29, 2014) (denying preliminary injunction to pharmacy seeking to stop its termination from provider network because pharmacy was terminated under provision permitting cancellation without cause upon 30-days notice; pharmacy did not suffer irreparable harm because the contract contemplated termination and therefore contemplated the alleged harm caused by termination). Stated otherwise, the harm is purely economic and therefore not irreparable.  While OmniPlus believes it is entitled to significant damages, that fact alone does not entitle OmniPlus to injunctive relief.

This is a standard breach of contract case in which the parties to the contract specifically contemplated that Express Scripts could terminate it.  I understand OmniPlus' position that the contract does not give Express Scripts the right to do it in the way that they have done it, but nothing before me suggests that Express Scripts does not have the power to terminate their network membership under the Provider Agreement.  Therefore, I cannot find that any damages flowing from that contemplated conduct are somehow so unique as to constitute irreparable harm. OmniPlus' claims of potential lost customers and revenue are really just claims of

---

[10] As stated above, OmniPlus offers no legal support for its newest argument that terminations without cause are prohibited by Texas law.  On the record before me I simply cannot find that a "written explanation" for termination means that the termination must be "for cause."

lost profits, which can be calculated and fully compensated by an award of money damages. They do not constitute irreparable harm sufficient to support the grant of injunctive relief. *See General Motors Corp.*, 563 F.3d at 319 (upholding denial of injunction because claims of lost customers and revenues may be fully compensated through an award of damages). The same is true of OmniPlus' claims of intangible injuries to goodwill and reputation, which are supported by nothing more than general business principles and are therefore too speculative to establish irreparable harm. *Id; see also Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (loss of customers and customer goodwill are compensable as money damages and do not support award of injunctive relief).

Although the lack of irreparable harm is a sufficient basis upon which to deny injunctive relief, I have also considered the remaining *Dataphase* factors. I do not find that the balance of equities favors injunctive relief because, if granted, an injunction here would force these two parties to continue to do business together even though their relationship is "over." Like the Court in *Trilogy Healthcare*, I too doubt "that this is a sensible remedy." 2013 WL 4832708 at *1. This is especially true here, where Express Scripts (whether rightly or wrongly) has declared that it can no longer trust OmniPlus. Express Scripts has submitted evidence that, if forced to continue doing business with OmniPlus, it will be required to constantly monitor all of OmniPlus' claims for accuracy, resulting in an

undue administrative burden and potential oversight by this Court.  Granting an injunction would also impact Express Scripts' clients, for if the for-cause termination of OmniPlus is ultimately justified, those clients will have been required to continue to do business with a pharmacy which has potentially driven up health care costs through improper billing practices.  This could result in higher premiums for members.  These potential outcomes weigh against injunctive relief when balanced against any potential harm to OmniPlus and any potential disruption that may be experienced by members who can no longer get their prescriptions filled by OmniPlus "in network."  OmniPlus offers no evidence that any members of Express Scripts' clients will be left without medication or access to medication if it is terminated from the network.  While it might be inconvenient for some members or physicians to use a new pharmacy, this factor cannot justify the grant of injunctive relief in this case.  For these reasons, injunctive relief is not warranted.

Finally, the Court believes that this is a case ripe for early referral to mediation.  Counsel previously represented that the party representatives were working well together; it appears to me that they might have achieved a potential resolution to this problem until the outside lawyers got involved.  This is a case that should be settled, so the Court expects all counsel and the appropriate

representatives to use their best efforts (and hopefully, their common sense) to do just that.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's motion for preliminary injunction [#16] is denied.

**IT IS FURTHER ORDERED** that defendants' motion for leave to file a supplemental brief [#57] is denied.

This case will be referred to mediation by separate Order and will be set for a Rule 16 Scheduling Conference, if necessary, only after mediation is completed.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 7th day of October, 2014.