**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| ALTERNATIVE MEDICINE | ) | |
| AND PHARMACY, INC. d/b/a | ) | |
| OMNIPLUS PHARMACY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Case No. 4:14-cv-01469-CDP |
| v. | ) | |
| | ) | |
| EXPRESS SCRIPTS, INC. | ) | |
| and MEDCO HEALTH SOLUTIONS, | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT ON THE MERITS OF PLAINTIFF'S CLAIMS**

Defendants Express Scripts, Inc. and Medco Health Solutions, Inc. (collectively, "Express Scripts") respectfully submit this memorandum in support of their motion for summary judgment on the merits of all claims alleged by Plaintiff Alternative Medicine and Pharmacy, Inc.'s ("OmniPlus").

**INTRODUCTION**

Plaintiff's case boils down to whether Express Scripts had the right to immediately terminate the parties' contract, thus ending OmniPlus' participation in Express Scripts' pharmacy provider network.  OmniPlus admits that it breached the parties' contract by failing to collect Express Scripts member copayments on a massive scale.  Consistent with statutes and regulations governing payment for healthcare services, OmniPlus' widespread failure to collect copayments is the same thing as waiving copayments, the very basis that Express Scripts provided for OmniPlus' termination.

The parties' contract required that OmniPlus "shall collect" – and shall not "waive" – copayments for prescriptions that OmniPlus dispensed to Express Scripts members.  The contract makes clear that if Express Scripts becomes aware of any information suggesting that OmniPlus had violated this requirement, then OmniPlus was subject to immediate termination.  At the time that Express Scripts terminated the contract, Express Scripts had obtained multiple statements from members who received prescriptions from OmniPlus, indicating that OmniPlus failed to collect the required copayment from them.  Any one of these statements gave Express Scripts the right to terminate the contract immediately.

While this alone was enough for Express Scripts to terminate OmniPlus, discovery in this action has pulled the curtain back on the extent to which OmniPlus breached the contract's copayment requirement.  OmniPlus concedes that it failed to collect the required copayment for about **80%** of all prescriptions that it dispensed to Express Scripts members between September 27, 2013 and October 7, 2014, or about **6,341** prescriptions in total.  OmniPlus further admits that, notwithstanding the requirement that it "shall collect" copayments, it does not require that members pay the copayments for prescriptions that OmniPlus dispenses.

If OmniPlus' copayment-related misconduct occurred in the context of a government-sponsored program, such as Medicare, it would rise to the level of potential criminality.  And yet OmniPlus acted as if – simply because it was dealing with a commercial payor like Express Scripts – this misconduct was somehow acceptable.  OmniPlus' misconduct renders hollow its complaints about the manner of its termination from Express Scripts' pharmacy provider network.  The contract unambiguously allowed Express Scripts to terminate the contract for this misconduct.

Accordingly, OmniPlus' breach of contract claim (Count I) must fail.  Express Scripts was entitled to immediately terminate OmniPlus, and OmniPlus cannot establish (as it must) that it performed its own contractual obligations.  To the contrary, OmniPlus has admitted that it breached its contractual obligations, and the undisputed facts show that OmniPlus did so repeatedly and systematically.  Express Scripts is therefore entitled to summary judgment on OmniPlus' breach of contract claim.

OmniPlus' claim for "Violation of Texas law" (Count II) fares no better.  The statutory and regulatory notice provisions invoked by OmniPlus in this claim do not, as a matter of law, provide for a private right of action.  Moreover, these notice provisions do not, here, affect Express Scripts' right to terminate the contract.  With respect to termination, they do not apply to pharmacy benefit managers such as Express Scripts, but rather to health care maintenance organizations and insurers.  And even if they did apply to entities like Express Scripts, the nature and extent of OmniPlus' misconduct renders them inapplicable under exceptions for fraud or malfeasance.  Accordingly, Express Scripts is also entitled to summary judgment on Count II.

STATEMENT OF FACTS[1]

## I.       The Parties and Their Contract.

Express Scripts is a pharmacy benefit manager ("PBM").  Express Scripts' Statement of Uncontroverted Material Facts ("SUMF") ¶ 1.  Express Scripts has created a pharmacy provider network by negotiating with pharmacies that agree to fill prescriptions for members of Express Scripts' client health plans.  Doc. No. 23-1 ¶ 6.  The integrity of Express Scripts' pharmacy provider network is critical to Express Scripts' business.  *Id*. ¶ 8.  A pharmacy that does not meet

---

[1] Certain of the facts set forth in this section are provided for background purposes.   Separately, and in accordance with Local Rule 7-4.01(E), Express Scripts is providing its Statement of Uncontroverted Materials Facts.

3

Express Scripts' standards for integrity and professionalism threatens Express Scripts' overall network and its reputation. *Id*.

OmniPlus was a member of Express Scripts' pharmacy provider network pursuant to a Pharmacy Provider Agreement ("Provider Agreement") and Network Provider Manual ("Provider Manual") (collectively the "Contract"). SUMF ¶¶ 2-3. The Provider Manual is incorporated into the Provider Agreement, and together they constitute the Contract. *Id*. ¶ 4.

The Contract provides for **immediate termination** in the event that, *inter alia*:

- OmniPlus "fails to comply … with Section 2.4 of this Agreement [dealing with copayments]";

- OmniPlus "no longer meets credentialing requirements";

- OmniPlus "fails to comply with [Express Scripts'] policies and procedures, including, but not limited to, the Provider Manual";

- "[A]ny representation to [Express Scripts] or any response to a question set forth on the Provider Certification is untrue or becomes untrue"; or

- OmniPlus "breaches any of its representations and warranties set forth in this Agreement or any other document provided to [Express Scripts]."

*Id*. ¶¶ 8-9.

Moreover, the Contract is immediately terminable if Express Scripts obtains a single statement suggesting that a provider, such as OmniPlus, may be waiving or offering to waive copayments:

> If [Express Scripts] becomes aware of any Copayment or cost-sharing discounts offered by [OmniPlus] – either through audit, investigation, Member statements, or review of [OmniPlus'] website or other advertising materials – [OmniPlus] may be subject to immediate termination. For clarification, if [Express Scripts] identifies fliers, advertisements, or other statements from [OmniPlus] suggesting that a Copayment will be a flat fee or will be discounted, capped, or waived, [OmniPlus] **will be subject to termination**.

*Id*. ¶ 7 (emphasis added).

These contractual provisions are discussed in more detail directly below.

### A.      Contractual Requirements Regarding the Collection of Copayments.

Copayments sensitize patients to the cost of prescription drugs, and therefore act as a check on fraudulent or inflated billing practices.  Doc. No. 23-1 ¶ 20.  For this reason, many of Express Scripts' clients require compounding pharmacies to charge a percentage of the total cost of a compounded drug as a copayment.  *Id*. ¶ 21.  When a pharmacy artificially inflates drug prices and members therefore face a correspondingly high copayment, members will often either complain (such that the cost inflation is caught) or simply not purchase the cost-inflated compound drug.  *Id*. ¶ 22.  Indeed, OmniPlus' own patients would sometimes cancel their prescriptions when confronted with the prospect of paying a large co-payment.  SUMF ¶ 31.

To avoid this, pharmacies engaged in the abusive pricing of compound drugs often undermine the copayment mechanism – and its pricing-checking function – by waiving or discounting copayments.  Doc. No. 23-1 ¶ 24.  Such practices are therefore prohibited under the Contract and serve as a basis for immediate termination from the network.

The Contract directly addresses this issue, requiring that OmniPlus "shall collect" – and may not "waive[] or discount[]" – applicable copayments:

> 2.4    **Collection of Copayments**; Member Hold-Harmless; Violation.
>
> 2.4.a    **Copayments.**  **Provider shall collect from Members** the lesser of the Usual and Customary Retail Price amount **or the applicable Copayment indicated by ESI, or when applicable, the full Copayment when indicated by ESI**, through its online processing system or if online processing is unavailable, in accordance with the Provider Manual.  **Copayments may not be waived or discounted** and, unless directed by ESI in writing, Provider shall not collect any greater amount or any other taxes, fees, surcharges or compensation from any Member for any Covered Medications or services provided in connection therewith.  In no event will ESI be liable for any Copayment.

SUMF ¶ 5.  Recognizing the importance of the copayment collection requirement, the Contract gives Express Scripts the right to "immediately terminate" the Contract if OmniPlus "fails to comply with Section 2.4 of this [Provider] Agreement" regarding copayments.  *Id.* ¶ 8.

The requirement that OmniPlus "shall collect" and cannot "waive" the applicable copayment is echoed in the Provider Manual, which states that OmniPlus "is to collect" copayments and that copayment amounts are "to be collected."  *Id.* ¶¶ 6-7.  Express Scripts may immediately terminate the Contract if it becomes aware of information – including information obtained through a member's statement – suggesting that OmniPlus is waiving, offering to waive, or undermining copayments:

### 2.2   Collection of Copayments

PBM defines patient financial responsibility to be the amount of money a Network Provider is to collect from a Member for the provision of Covered Medications.  This amount can include Copayment or Coinsurance (a percentage "Copayment").  Sponsors determine the Copayment amounts to be collected. Copayment amounts vary from Sponsor to Sponsor and/or Prescription Drug Program.  Network Provider shall ensure that the correct Copayment is charged to the Member and is not changed or waived. Should a Member have a question about his or her Copayment or deductible and benefit limits, please instruct him/her to call the Customer Service number listed on the Member's Identification Card.

Network Provider may not institute Member Copayment discount programs or otherwise alter a Member Copayment, unless such waiver or discount is required by law.  If PBM becomes aware of any Copayment or cost-sharing discounts offered by Network Provider – either through audit, investigation, Member statements, or review of Network Provider's website or other advertising materials – Network Provider may be subject to immediate termination.  For clarification, if PBM identifies fliers, advertisements, or other statements from Network Provider suggesting that a Copayment will be a flat fee or will be discounted, capped, or waived, Network Provider will be subject to termination.

*Id.* ¶ 7.

### B.   Contractual Requirements Regarding Credentialing, the Provider Certification, and the Accuracy of Representations Made by OmniPlus to Express Scripts.

As a condition of participating in its pharmacy provider network, Express Scripts requires network pharmacies to submit a Provider Certification for credentialing purposes.  Doc. 23-1 ¶¶ 28-29.  The Provider Certification is incorporated into and a part of the Contract.  SUMF ¶ 47.

6

The Provider Certification contains a number of questions regarding the pharmacy's business practices and the types of services that the pharmacy offers.  Doc. No. 23-1 ¶ 31.  In submitting its  Provider Certification, OmniPlus certified that each answer was "true and correct" and agreed to "notify Express Scripts immediately in writing in the event of a change in the information provided which would make any part of this Provider Application untrue or inaccurate."  SUMF ¶ 49.

The Contract speaks squarely to the importance of OmniPlus providing accurate information to Express Scripts on the Provider Certification, stating that Express Scripts has the right to immediately terminate OmniPlus if OmniPlus "no longer meets credentialing requirements."  *Id.* ¶ 8.  The Contract provides, further, that Express Scripts shall have the right to immediately terminate the Contract if "[a]ny representation to [Express Scripts] or any response to a question set forth on the Provider Certification is untrue or becomes untrue …." *Id.* ¶ 9.

## II. OmniPlus Breached the Contract by Waiving Copayments – Routinely and Systematically Failing to Collect Them.

### A. Express Scripts Received Statements from Members Suggesting that OmniPlus Had Waived Copayments.

In May 2014, Express Scripts received several statements from members which suggested that OmniPlus was waiving copayments.  One member (referred to here as "Member A") reported that OmniPlus informed him that, after the member made repeated inquiries about the copayment, it "would send [an] invoice" to him for the copayment, but "wouldn't try to collect":



*Id.* ¶ 14.

Another member (referred to here as "Member P") had a prescription filled by OmniPlus on March 5, 2014.  *Id.* ¶ 15.  Member P reported to Express Scripts on May 29, 2014 that she had not even been billed for the copayment related to a prescription dispensed more than two months earlier, on March 5, 2014:

| PRESCRIPTION NUMBER | DATE OF FILL | DRUG NAME/ACTIVE INGREDIENT | BILLED AMOUNT | RECEIVED? YES or NO | CO-PAY PAID? YES or NO | CO-PAY AMOUNT, IF YES |
|---|---|---|---|---|---|---|
| REDACTED | 3/5/2014 | Compound | $5,177.09 | yes | no bill so far | |

*Id.*

Two other members (referred to here as "Member G" and "Member N") had prescriptions filled by OmniPlus in March 2014 and reported to Express Scripts in late May 2014 that they had not paid the required copayments for these prescriptions.  *Id.* ¶ 16.

8

B.    **OmniPlus Admits That It Failed To Collect Copayments For the Overwhelming Majority of Prescriptions That It Dispensed to Express Scripts Members.**

Discovery in this case has confirmed that OmniPlus routinely and systematically failed to collect member copayments.  Consider the following undisputed figures:

- For prescriptions that OmniPlus dispensed to Express Scripts members from September 27, 2013 through June 30, 2014, OmniPlus failed to collect the required copayment for approximately **3,936** prescriptions, or about **84.37%** of the total prescriptions that it dispensed to these members during this period. *Id*. ¶¶ 17; 20.  The average cost of these prescriptions was about $4,480, and OmniPlus received over $16.6 million in reimbursements from Express Scripts for these prescriptions.  *Id*. ¶¶ 18-19.

- For prescriptions that OmniPlus dispensed to Express Scripts members from July 1, 2014 through October 7, 2014, OmniPlus failed to collect the required copayment for approximately **2,405** prescriptions, or about **75%** of the total prescriptions that it dispensed to these members during this period.  *Id*. ¶¶ 21; 24.   The average cost of these prescriptions was about $3,970, and OmniPlus received over $9.1 million in reimbursements from Express Scripts for these prescriptions.  *Id*. ¶¶ 22-23.

- Thus, for prescriptions that OmniPlus dispensed to Express Scripts members from September 27, 2013 through October 7, 2014, OmniPlus failed to collect the required copayment for approximately **6,341** prescriptions, or about **80%** of the total prescriptions that it dispensed to these members during this period.

*Id*. ¶ 25.   OmniPlus received over $25 million in reimbursements from Express Scripts for these prescriptions.  *Id*. ¶ 26.[2]

In addition to this overwhelming evidence, there are repeated instances where OmniPlus would fill a prescription for a member and then refill the same prescription for the member month after month, all without ever requiring the member to actually pay the copayments for the earlier fills.  Put another way, OmniPlus continued to refill prescriptions for members without doing anything to ensure that the member had paid the outstanding copayments for earlier fills of the same prescription dispensed by OmniPlus.

The charts below illustrate this for select prescriptions that OmniPlus refilled for a given member on a monthly basis.  Omniplus has admitted that the information in each of these charts is accurate (*id*. ¶ 27):

**COPAYMENTS FOR PRESCRIPTION #108077**

| Date Dispensed by OmniPlus | Total Cost of Prescription | Copayment Amount | Copayment Collected? |
|---|---|---|---|
| 5/31/14 | $4,481.05 | $2,327.28 | No |
| 6/26/14 | $4,481.05 | $1,344.32 | No |
| 7/25/14 | $4,481.05 | $1,344.32 | No |

*Id*.

---

[2] The Contract covers two periods, with substantively identical operative terms.  The parties had a Provider Agreement dated September 27, 2013.  SUMF ¶ 3.  OmniPlus executed a second Provider Agreement on or about June 30, 2014.  *Id*.  October 7, 2014 is the date that the Court denied OmniPlus' motion for a temporary restraining order and preliminary injunction mandating that Express Scripts retain OmniPlus in its pharmacy provider network.  Doc. No. 59.

**COPAYMENTS FOR PRESCRIPTION #106824**

| Date Dispensed by OmniPlus | Total Cost of Prescription | Copayment Amount | Copayment Collected? |
|---|---|---|---|
| 5/15/14 | $4,150.57 | $2,075.28 | No |
| 6/9/14 | $4,431.55 | $2,215.78 | No |
| 7/8/14 | $4,237.15 | $2,118.57 | No |
| 7/31/14 | $4,431.55 | $2,215.78 | No |

*Id*.

**COPAYMENTS FOR PRESCRIPTION #105345**

| Date Dispensed by OmniPlus | Total Cost of Prescription | Copayment Amount | Copayment Collected? |
|---|---|---|---|
| 4/17/14 | $4,150.57 | $2,075.28 | No |
| 5/13/14 | $4,150.57 | $2,075.28 | No |
| 6/12/14 | $4,431.55 | $2,215.78 | No |
| 7/11/14 | $4,237.15 | $2,118.57 | No |
| 8/6/14 | $4,431.15 | $2,215.78 | No |

*Id*.

C.     **OmniPlus' Protocols and Procedures Regarding the Collection of Copayments**

Not surprisingly, given the facts above, OmniPlus' protocols and procedures confirm that

it waives member copayments.  For example:

- OmniPlus never requires a member with commercial insurance to actually pay the copayment.   For members to whom OmniPlus ships prescriptions, OmniPlus "does not insist that it receive payment for the copayment before dispensing the prescription."  *Id*. ¶ 28.  Rather, "[i]f the patient says that they can't pay at this time or [asks] will you bill me," then OmniPlus "generate[s] an invoice and mail[s] that to the patient."  *Id*. ¶ 29.  However, "unless those

[members] specifically inquired about the amount of the co-payments, they would not have known how much they owed for that prescription drug until they received an invoice in the mail from OmniPlus." *Id*. ¶ 30.

- Beyond perhaps sending a single invoice to a member regarding a copayment, OmniPlus does "nothing to insist on actual payment of that copayment" by a member. *Id*. ¶ 32.

- OmniPlus representatives were instructed to tell members who inquired about their copayments that OmniPlus would send them an invoice but "will not turn them over or report to collection agencies." *Id*. ¶ 33.  OmniPlus has never sent any member to a collection agency for unpaid copayment balances that are owed to OmniPlus, regardless of the amount. *Id*. ¶ 38.

- OmniPlus' invoices to members have no due date. *Id*. ¶ 34.  OmniPlus never sends follow-up invoices. *Id*. ¶ 35.

- OmniPlus does not make follow-up phone calls to members asking them whether they intend to pay the copayment. *Id*. ¶ 36.

- OmniPlus does not charge any interest for outstanding account balances related to unpaid copayments. *Id*. ¶ 37.

Moreover, OmniPlus' records reflect that patients' accounts receivables related to unpaid copayments are "current," regardless of how long those accounts have been outstanding and the copayments have gone unpaid. *Id*. ¶ 40.  Indeed, OmniPlus' corporate representative conceded that OmniPlus has no system in place to track whether or not patients actually pay their copayments. *Id*. ¶ 39.  In other words, even if OmniPlus had endeavored to follow up with members regarding unpaid copayments in any manner – which it did not – the pharmacy had no mechanism to determine what members' copayments were unpaid in the first instance. *See id*.

Interestingly, OmniPlus had a written policy regarding copayment waivers that was prepared in order to address Medicare requirements related to such waivers. *Id*. ¶ 41.  Under that policy, copayments could not be waived unless (1) there was a determination that the patient had a financial hardship *or* (2) reasonable good faith efforts to collect had been exhausted. *Id*. ¶ 42.  OmniPlus' former Vice-President of Operations Branko Milosevic, who certified to Express

12

Scripts that OmniPlus never waived copayments, admitted that if there is no financial hardship and no exhaustion of reasonable good faith efforts to collect, then the non-receipt of a copayment "would be a prohibited waiver."  *Id.* ¶ 43.

### C. OmniPlus Breached the Contract by Lying on the Provider Certification About Its Copayment Collection Practices.

On March 4, 2014, OmniPlus submitted a Provider Certification to Express Scripts.  *Id.* ¶ 46.  OmniPlus knew the importance of providing true and accurate information on the Certification, and it certified that "each answer on this Provider Certification … is true and correct" and agreed to notify Express Scripts immediately if any information provided therein became untrue or inaccurate.  *Id.* ¶¶ 48-49.  OmniPlus agreed that any failure to provide true and accurate information would be considered a breach of the Provider Agreement that could result in immediate termination.  *Id.* ¶ 50.  OmniPlus "wanted Express Scripts to rely on the information it was providing" in the Certification (*id.* ¶ 51), and OmniPlus never notified Express Scripts that any information provided or representation made in the Provider Certification was untrue or inaccurate.  *Id.* ¶ 52.

Question No. 29 on the Provider Certification asked OmniPlus:  "Do you or your pharmacies ever waive or offer a reduction of member copayments?"  *Id.* ¶ 53.  OmniPlus answered "No" in response to Question No. 29.  *Id.* ¶ 54.  This statement was false.  *See* pp. 7-13, *supra* & 17-20, *infra*.  Accordingly, this false statement provided a clear basis for immediate termination of the Contract.  SUMF ¶¶ 8-9.

### STANDARD OF REVIEW

The standards for summary judgment are well-established:

- Summary judgment should be entered where "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

- "A moving party always bears the burden of informing the Court of the basis for its motion." *L.C. Goliday v. GKN Aerospace-St. Louis Aerospace*, 2012 WL 2885358, at *3 (E.D. Mo. July 13, 2012) (citing *Celotex v. Catrett*, 477 U.S. 317, 323 (1986)). "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting Fed. R. Civ. P. 56(c)). However, "[o]nce the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the 'mere existence of some alleged factual dispute.'" *Id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)).

- To survive a motion for summary judgment, the "nonmoving party must substantiate [its] allegations with sufficient probative evidence [that] would permit a finding in [its] favor based on more than mere speculation, conjecture, or fantasy." *Wilson v. Int'l Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011) (citations omitted).

- "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

In addition, where as here a party has failed to file a required responsive pleading denying the factual allegations made in a claim, counterclaim, or cross-claim, those factual allegations are deemed admitted for purposes of a motion for summary judgment. *See* Fed. R. Civ. P. 8(b)(6) ("An allegation – other than one relating to the amount of damages – is admitted if a responsive pleading is required and the allegation is not denied."); *see also* Doc. No. 101 (Defendant's Memorandum of Law in Support of Their Motion for Summary Judgment on Their Breach of Contract Counterclaim) at 6-8, and authority cited therein (explaining that, by virtue of its failure to file an Answer to Defendants' Counterclaim, OmniPlus has admitted the factual allegations therein as a matter of law).

14

## ARGUMENT

I.  **OmniPlus' Breach of Contract Claim Fails Because (A) the Contract  Allowed Express Scripts to Terminate OmniPlus and (B) OmniPlus Failed, In Any Event, To Perform Its Contractual Obligations.**

In its breach of contract claim (Count I), OmniPlus alleges that Express Scripts improperly terminated OmniPlus from Express Scripts' pharmacy provider network.   To establish its breach of contract claim, OmniPlus must prove each of the following elements:  "(1) the existence and terms of a contract; (2) that [OmniPlus] performed or tendered performance pursuant to the contract; (3) breach of the contract by [Express Scripts]; and (4) damages suffered by [OmniPlus]."  *Keveney v. Mo. Military Acad.*, 304 S.W.3d 98, 104 (Mo. 2010).

Count I fails for two reasons.  *First*, Express Scripts had the right to terminate OmniPlus immediately.  Even just one of the member statements suggesting that OmniPlus offered to waive or had waived copayments gave Express Scripts the right to terminate the Contract.  But, of course, the now-apparent routine and systematic waiver of copayments by OmniPlus undoubtedly allowed Express Scripts to terminate the Contract.  Thus, Express Scripts did not breach the Contract by terminating OmniPlus.

*Second*, and in any event, OmniPlus cannot show that it fulfilled its own contractual obligations.  Indeed, OmniPlus has admitted that it breached its contractual obligations by failing to collect copayments.  SUMF ¶ 45.  Missouri law recognizes that a party cannot prevail on a breach of contract claim when it fails to perform its own obligations under the contract.  *See Keveney*, 304 S.W.3d at 104.  Express Scripts is entitled to summary judgment on Count I.

A.  **The Contract Allowed Express Scripts to Immediately Terminate OmniPlus.**

OmniPlus cannot show that Express Scripts breached the Contract.  Express Scripts was well within its rights to immediately terminate the Contract based on the following:

SLC-7728993

- the member statements Express Scripts received which suggested that OmniPlus was waiving copayments;

- OmniPlus' routine and systematic failure to collect copayments in violation of the Contract; and

- OmniPlus' provision of false and inaccurate information on its Provider Certification.

*See* pp. 7-13, *supra*.

The Contract allows Express Scripts to immediately terminate OmniPlus based upon any

evidence or indication that OmniPlus has waived or offered to waive copayments:

> **If [Express Scripts] becomes aware of any Copayment or cost-sharing discounts being offered by [OmniPlus] – either through audit, investigation, Member statements, or review of [OmniPlus'] website or other advertising materials – [OmniPlus] may be subject to immediate termination.** For clarification, if [Express Scripts] identifies fliers, advertisements, or other statements from [OmniPlus] suggesting that a Copayment … will be discounted, capped, or waived, [OmniPlus] will be subject to termination.

SUMF ¶ 7 (emphasis added).   Express Scripts received multiple statements from members

indicating that OmniPlus offered to waive and had waived copayments.  *See* pp. 7-8, *supra*.

These member statements alone provided sufficient basis for immediate termination.

The evidence developed in discovery confirms OmniPlus' systematic copayment-related

violations of the Contract.   The Contract required that OmniPlus "***shall collect***" copayments.

SUMF ¶ 5 (emphasis added).   Missouri courts interpret contracts according to the "plain

meaning of the terms the parties used."  *Hellmann v. Sparks*, --- S.W.3d ---, 2015 WL 1021307,

at *5 (Mo. Ct. App. Mar. 6, 2015) (citing *Marshall v. Pyramid Dev. Corp.*, 855 S.W.2d 403, 406

(Mo. Ct. App. 1993)).   "The plain and ordinary meaning of words used may be derived from the

dictionary."  *Id*. (citing *Bailey v. Federated Mut. Ins. Co.*, 152 S.W.3d 355, 357 (Mo. Ct. App.

2004)).

The requirement that OmniPlus "shall collect" copayments is clear. Start with the word "shall." "The word 'shall' is an expression of compulsion and obligation. Its use implies a mandatory requirement as opposed to discretionary or permissive act." *Matter of Estate of Monia*, 902 S.W.2d 379, 382 (Mo. Ct. App. 1995) (citations omitted); *see also Claudio-DeLeon v. Sistema Universitario Ana G. Mendez*, 775 F.3d 41, 46-47 (1st Cir. 2014) ("[I]t is axiomatic that the word 'shall' has a mandatory connotation."). And the word "collect" means "to claim as due ***and receive payment for***." MERRIAM-WEBSTER'S COLLEGE DICTIONARY 243 (11th ed. 2003) (emphasis added). As one court has explained: "By definition, the ***receipt of a payment is essential to a collection***." *Spoor v. PHH Mortg. Corp.*, 2011 WL 883666, at *7 (N.D. W.Va. Mar. 11, 2011) (emphasis added). The Contract thus required OmniPlus to actually receive money from a member in order to have "collected" the copayment. It is undisputed that OmniPlus, having failed to collect the required copayments for about 80% of prescriptions dispensed to Express Scripts members during the pertinent time period, breached this requirement on a massive scale.

This systematic failure to collect copayments is, in turn, a species of copayment "waiver." Federal statutory and regulatory guidance illustrates this. For instance, Section 231(h) of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), codified at 42 U.S.C. § 1320a-7a, authorizes the imposition of a civil monetary penalty against any person who "offers to or transfers remuneration to any individual eligible for benefits under [a government healthcare program] that such person knows or should know is likely to influence such individual to order or receive from a particular provider, practitioner, or supplier any item or service for which payment may be made, in whole or in part, under [a government healthcare program.]" 42 U.S.C. § 1320a-7a(5). "The term 'remuneration' includes the waiver of coinsurance and

17

deductible amounts (or any part thereof)," except where:  "(i) the waiver is not offered as part of any advertisement or solicitation; (ii) the person does not routinely waive coinsurance or deductible amounts; *and* (iii) the person [making the waiver] (I) waives the coinsurance and deductible amounts after determining in good faith that the individual is in financial need; or (II) *fails to collect* coinsurance or deductible amounts *after making reasonable collection efforts*…."  42 U.S.C. § 1320a-7a(i)(6) (emphasis added).

The statute itself does not define "reasonable collection efforts," but the Medicare Provider Reimbursement Manual does:

> To be considered a reasonable collection effort, a provider's effort to collect Medicare deductible and coinsurance amounts must be ***similar to the effort the provider puts forth to collect comparable amounts from non-Medicare patients***. It must involve the issuance of a bill on or shortly after discharge or death of the beneficiary to the party responsible for the patient's personal financial obligations.  ***It also includes other actions such as subsequent billings, collection letters and telephone calls or personal contacts with this party <u>which constitute a genuine, rather than a token, collection effort</u>***.  The provider's collection effort may include using or threatening to use court action to obtain payment.

MEDICARE PROVIDER REIMBURSEMENT MANUAL *at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021929.html    (Part    I)    & https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021935.html (Part II) § 310 (emphasis added).[3]

---

[3] *See also, e.g.*, Department of Health & Human Services, Office of the Inspector General, ADVISORY OPINION NO. 97-4 (September 24, 1997) (hereinafter "OIG ADVISORY OPINION") *at* http://oig.hhs.gov/fraud/docs/advisoryopinions/1997/97_4.pdf, concluding that a proposed arrangement where a surgical center "would not pursue payment from the covered beneficiaries" via an agreement with an administrator offering complimentary coverage "***would effectively waive*** the Medicare Copayment" for those beneficiaries subject to the proposed arrangement, in violation of Section 1128B of the Social Security Act, codified at 42 U.S.C. § 1320a-7b ("Criminal penalties for acts involving Federal health care programs"), and explaining:

> When providers forgive financial obligations for reasons other than genuine financial hardship of the particular patient, they unlawfully may be inducing the

18

This is how we know, here, that OmniPlus waived Express Scripts member copayments on a colossal scale. Having failed to collect copayments for about 80% of the relevant prescriptions, OmniPlus engaged in nothing approaching "reasonable collection efforts." OmniPlus did "nothing to insist on actual payment of [a] copayment," beyond perhaps sending a single invoice. SUMF ¶¶ 28; 32. But those invoices had no due date. *Id*. ¶ 34. OmniPlus never sent follow-up invoices or made follow-up phone calls to Express Scripts members. *Id*. ¶¶ 35-36. OmniPlus had no systems in place to even track unpaid member copayments. *Id*. ¶¶ 39-40. OmniPlus did not charge interest on outstanding account balances related to unpaid copayments. *Id*. ¶ 37. OmniPlus affirmatively told Express Scripts members who inquired about their copayments that they would not be referred to collections (*id*. ¶ 44), and not one member was referred to collections, regardless of the amount of the copayment (*id*. ¶ 38). And OmniPlus knew that the non-receipt of a copayment from a member, absent the exhaustion of reasonable collection efforts, "would be a prohibited waiver." *Id*. ¶ 43.

In the end, OmniPlus failed to collect, and thereby waived, copayments for about 80% of all prescriptions it dispensed to Express Scripts members between September 27, 2013 and October 7, 2014. SUMF ¶¶ 17-26. The Contract gave Express Scripts the explicit right to

---

patient to purchase items or services in violation of the anti-kickback statute's proscription against offering or paying something of value as an inducement to general business payable by a Federal health care program. Thus, except in those special cases of financial hardship, ***providers must make a good faith effort to collect Medicare Copayments. <u>One indicator of a suspect waiver is the failure to collect Medicare Copayments</u>*** for a specific group of Medicare patients for reasons unrelated to indigency.

*Id*. at 4 (emphasis added); *Publication of OIG Special Fraud Alerts*, 49 Fed. Reg. 65372-01, 65374 (Dec. 19, 1994) ("Routine waiver of deductibles and copayments by charge-based providers, practitioners or suppliers is unlawful because it results in (1) false claims, (2) violations of the anti-kickback statute, and (3) excessive utilization of items and services paid for by Medicare.").

"immediately terminate" the Contract if OmniPlus failed to satisfy the obligation that it "shall collect" – and shall not "waive" – member copayments. *Id*. ¶¶ 5-9.

To make matters worse, OmniPlus provided false information to Express Scripts on the Provider Certification.   OmniPlus answered with an unqualified "No" in response to the question, "Do you … ever waive or offer a reduction of member copayments?"  *Id*. ¶¶ 53-54. Given the evidence set forth above, this was false.  *See* pp. 7-13; 17-20, *supra*; *compare* SUMF ¶ 32 (OmniPlus does "nothing to insist on actual payment of that copayment by the customer") *with* MERRIAM-WEBSTER'S COLLEGE DICTIONARY 243 (defining "waive" as "to refrain from pressing or enforcing (as a claim or rule)"); BLACK'S LAW DICTIONARY 1813 (10th ed. 2014) (defining "waive" as "[t]o refrain from insisting on (a strict rule, formality, etc.); to forego"); OIG ADVISORY OPINION at 4 ("[P]roviders must make a good faith effort to collect Medicare Copayments.   One indicator of a suspect waiver is the failure to collect Medicare Copayments…."). OmniPlus was waiving copayments, and then lied about it in its Provider Certification.

*      *      *

In sum, Express Scripts had every right to terminate OmniPlus.  Multiple members gave statements to Express Scripts suggesting that OmniPlus was offering to waive and waiving copayments in violation of the parties' Contract.  These statements allowed Express Scripts to terminate OmniPlus.   In any event, OmniPlus now concedes that it failed to collect the contractually required copayments for about 80% of the relevant prescriptions dispensed to Express Scripts members, thus making it clear that OmniPlus waived copayments in direct violation of the Contract.  And this, of course, makes OmniPlus' representation to the contrary on the Provider Certification (*i.e.*, that it never waived copayments) false.

The Contract clearly authorized Express Scripts to immediately terminate OmniPlus, and Express Scripts' right to do so must be enforced.   *See Malan Realty Inv'rs, Inc. v. Harris*, 953 S.W.2d 624, 626-27 (Mo. 1997) (when contract terms are plain, "the court is bound to enforce the contract as written").  Express Scripts is entitled to summary judgment on Count I.

### B.      OmniPlus Failed to Perform Its Contractual Obligations.

To establish its claim for breach of contract, OmniPlus must also prove, among other things, that it "performed or tendered performance pursuant to the contract …."  *Keveney*, 304 S.W.3d at 104.  "If a party fails to prove one of the elements of a breach of contract action, his claim fails."  *Midwest Bankcentre v. Old Republic Title Co. of St. Louis*, 247 S.W.3d 116, 128 (Mo. Ct. App. 2008); *see also Rainey-Hicks v. Mo. Accreditation of Programs for Children & Youth*, 466 S.W.3d 699, 704 (Mo. Ct. App. 2015) (affirming grant of summary judgment in defendants' favor on plaintiff's breach of contract claim because plaintiff "cannot prove that she performed or tendered performance as required by the alleged contract, an essential element of her breach of contract claim"); *Rosenthal v. Jordan*, 783 S.W.2d 452, 455 (Mo. Ct. App. 1990) ("[P]roof of performance or tender of performance is essential to recovery on an express contract.")

OmniPlus' admitted failures to perform its contractual obligations, as described in detail above (*see* pp. 7-13; 17-20, *supra*), and as further conceded by OmniPlus' failure to answer Express Scripts' counterclaim (*see* SUMF ¶ 45), defeat its breach of contract claim as a matter of law.  *See Rainey-Hicks*, 466 S.W.3d at 704; *Rosenthan*, 783 S.W.2d at 455.  For this reason, as well, Express Scripts is entitled to summary judgment on Count I.

II.     **OmniPlus' Reliance on "Texas Law" or the Contract's Texas Regulatory Addendum Does Not Support Any of Its Claims.**

A.     **OmniPlus Has No Private Right of Action to Enforce the Provisions of "Texas Law" It Relies On in Count II.**

None of the Texas law provisions cited by OmniPlus in Count II of its Complaint – Texas Insurance Code Sections 843.306 and 1301.057 and regulations promulgated thereunder and codified at 28 T.A.C. §§ 3.3703(1)(19), 3.3706(d), and 11.901(a)(4) – provides for a private right of action.  Thus, the Court must grant summary judgment in Express Scripts' favor on Count II, "Violation of Texas Law."

Whether a statutory or regulatory regime is enforceable via a private right of action is a question of law appropriate for disposition on a motion for summary judgment.  *See, e.g.*, *Holmes v. Trinity Health*, 729 F.3d 817, 824-25 (8th Cir. 2013) (affirming district court's grant of summary judgment on plaintiff's statutory claim because there was no private right of action under the statute at issue).  Addressing the question requires the Court to "determine what the state's highest court would hold if it were called on to decide the issue" (*id*. at 824), mindful that it "is not the role of a federal court to expand state law in ways not foreshadowed by state precedent."  *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 673 (8th Cir. 2009); *see also, e.g.*, *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 637 (7th Cir. 2007) ("given a choice between an interpretation of state law which reasonably restricts liability, and one which greatly expands liability, we should choose the narrower and more reasonable path").

"[T]he Texas Supreme Court applies a 'strict rule of construction' to statutory enforcement schemes and implies a cause of action only when the Legislature's intent to create a private cause of action is ***clearly expressed from the language of the statute as written***."  *Coll v. Abaco Operating LLC*, 2011 WL 1831748, at *5 (E.D. Tex. May 12, 2011) (discussing *Brown v.*

*De La Cruz*, 156 S.W.3d 560, 566-67 (Tex. 2004)) (emphasis added).  "Courts interpreting statutes presume that the Legislature selected language in a statute with care and that every word or phrase was used with a purpose in mind."  *Id*. at *4 (citing *In re Caballero*, 272 S.W.3d 595, 599 (Tex. 2008)).  Implying a private right of action based on legislative silence "is a hazardous enterprise, at best …."  *Witkowski v. Brian, Fooshee & Yonge Props.*, 181 S.W.3d 824, 831 (Tex. Ct. App. 2005) (quoting *Touche Ross & Co. v. Redington*, 442 U.S. 560, 571-72 (1979)).  Ready indications that the legislature intended to create a private right of action by statute include such things as (a) "language indicating that an individual may bring a cause of action" under the statute and (b) a privately enforceable "penalty … for failure to comply" with the statute's requirements.  *Thomas v. Ocwen Loan Servicing*, 2013 WL 3245953, at *2 (S.D. Tex. June 25, 2013).

OmniPlus can point to no "language indicating that an individual may bring a cause of action" nor to any privately enforceable "penalty … for failure to comply" (*id*., at *2) in the statutory or regulatory provisions which it invokes.  These provisions are either silent, or contain language to the contrary.  For instance, the Subchapter or the Texas Administrative Code containing 28 T.A.C. §§ 3.3703(a)(19) & 3.3706(d) provides:  "These sections ***do not create a private cause of action*** for damages or create a standard of care, obligation, or duty that provides a basis for a private cause of action."  28 T.A.C. § 3.3701(d) ("Applicability and Scope") (emphasis added).

The Texas legislature has not created a private right of action for alleged violations of the statutory and regulatory provisions cited by OmniPlus.  Given this, the Court should enter summary judgment in Express Scripts' favor on Count II.

**B.     The Texas Regulatory Addendum to the Contract Does Not Save OmniPlus'
        Breach of Contract Claim (Count I).**

OmniPlus may argue that, notwithstanding its serial violations of the Contract, Express
Scripts could not immediately terminate OmniPlus because of various Texas statutory and
regulatory provisions that are referenced in the Texas Regulatory Addendum to the Contract.
Any such argument lacks merit for several reasons.

*First*, the Addendum itself makes clear that its "Termination" provision (which OmniPlus
will presumably rely on) applies only "to the extent required by law."  SUMF ¶ 12.  The Texas
statutory and regulatory provisions referenced in the Addendum apply to contracts between
healthcare providers and health maintenance organizations ("HMO's") or insurers.  *See* Tex. Ins.
Code § 843.306(a) (governing applicable procedures when an HMO terminates a contract with a
physician or provider); Tex. Ins. Code § 1301.047 (governing applicable procedures when an
insurer terminates a contract with a preferred provider); 28 T.A.C. §§ 3.3703(a), 3.3706(d)
(pertaining to contracts between insurers and providers); 28 T.A.C. § 11.901(a)(4) (pertaining to
contracts between HMO's and providers).  As a PBM, Express Scripts is neither an HMO nor an
insurer.  Accordingly, nothing in the "law" – and, thus, nothing in the Contract – required
Express Scripts to give OmniPlus additional notice of termination or to provide OmniPlus with a
non-binding review process prior to termination.[4]

*Second*, even if the Texas statutory and regulatory provisions referenced in the
Addendum did apply to the parties' Contract, the provisions pertaining to the termination of a

---

[4] Even assuming, *arguendo*, that some provision of Texas law does apply to the parties' Contact,
the Addendum also makes clear that it would only apply to the extent that OmniPlus "provides
services … to Members of an HMO licensed under Texas law" and then only to "those services
provided to Members of [such HMO's] …."   SUMF ¶ 11.  Therefore, OmniPlus' breach of
contract claim, as predicated on the Texas Regulatory Addendum, must be limited specifically to
the purportedly deficient notice of termination as applied only to the provision of services to
members of an HMO licensed under Texas law.

provider have carve-outs for cases of "fraud or malfeasance" by the provider (*i.e.*, OmniPlus). *See* Tex. Ins. Code §§ 843.306(b)(3), 1301.057(a)(2)(C); 28 T.A.C. § 3.3703(d)(2)(C).   Put another way, the Addendum's termination provision does not apply in cases of fraud or malfeasance by OmniPlus.

Texas courts have long applied "malfeasance" as a simple legal term of art referring to affirmative conduct in breach of a contract:  "If the gist of an action is the breach of a contract, either by malfeasance or nonfeasance, it is in substance an action on the contract …."  Tex. Jur. 3d § 56 (2015) (citing cases); *accord Int'l Printing Pressmen & Assistants' Union of N. Am. v. Smith*, 198 S.W.2d 729, 735 (Tex. 1946) (same).   When OmniPlus falsely represented that it never waived copayments, despite OmniPlus' clear pattern and practice of rank disregard for collection of Express Scripts member copayments, OmniPlus at a minimum committed malfeasance in breach of the parties' contract.  *See also* BLACK'S LAW DICTIONARY 775 (10th ed. 2014) (defining "malfeasance" as, *inter alia*, a "dishonest act").   To conclude otherwise would strip that term of any meaning or force.

***Finally***, any notice of termination purportedly required by the Texas Regulatory Addendum was utterly futile, and "[t]he law does not require written notice to be given when doing so would be a vain and useless act."  *Stacey v. Redford*, 226 S.W.3d 913, 918 (Mo. Ct. App. 2007), and cases cited therein (explaining further that Missouri law "does not prevent immediate termination of [an] agreement if the breach is incurable" as it "would … serve[] no purpose").[5]

---

[5] *See also, e.g., Dwyer v. Unit Power, Inc.*, 965 S.W.2d 301 (Mo. Ct. App. 1998) (noting that, where additional details regarding the extent of plaintiffs' breach came to light during the course or litigation:  "It is questionable whether it is possible for [the plaintiffs] to remedy a breach such as occurred here, or to expect [the defendant] to continue to perform the contract") (quotations omitted); *Love v. Beck Energy Corp.*, 2015 WL 1453338, at *9 (Ohio Ct. App. Mar. 31, 2015)

OmniPlus knew that it could be terminated immediately by no later than its March 4, 2014 submission of the Provider Certification – over seven months prior to its termination – when it represented that each answer given therein was "true and correct" and agreed that if any answer was or became untrue or inaccurate OmniPlus would be in breach and subject to immediate termination.   SUMF ¶¶ 49-50.   OmniPlus knew that it was specifically under investigation regarding its copayment collection practices (again, a potential basis for immediate termination, *see id.* ¶¶ 5-9) no later than May 1, 2014 – over five (5) months prior to its termination – when an Express Scripts investigator sent a letter to OmniPlus, seeking evidence that OmniPlus collected copayments for selected prescriptions that it dispensed in early 2014. *Id.* ¶ 13.  By no later than that same month, OmniPlus was well aware of both the fact and scope of its breach:  OmniPlus was neither recording copayments against patient accounts, nor tracking copayment collection in any reliable manner, because it could not.  *Id.* ¶¶ 39-40.

Despite this knowledge, OmniPlus' refrain for months thereafter – including before the Court – has been that it did nothing wrong:  *e.g.*, claiming on August 25, 2014 that the termination was "sudden" and "unanticipated" (Doc. No. 5 at 3); that "the alleged reason for the termination is itself false" (*id.* at 4); that "OmniPlus does not in fact waive … copayments" (*id.* at 13); and that the Texas statutory review process was somehow required for OmniPlus to

(holding that it would have been futile for non-breaching party to give notice to breaching parties where "through the entire proceedings [the breaching parties] have been adamant" that their actions did not constitute a breach); *Delvecchio v. Bayside Chrysler Plymouth Jeep Eagle, Inc.*, 271 A.D.2d 636, 639 (N.Y. App. Div. 2000) ("[T]he contract in this case did not afford the plaintiff an opportunity to cure and, for the most part, his alleged misfeasance was not, in any event, curable.  Thus, in this case, notice was not a material term of the contract."); *Larken, Inc. v. Larken Iowa City Ltd.*, 589 N.W.2d 700, 701-05 (Iowa 1998) (hotel owner had right to immediately terminate manager, despite express contract language requiring notice and right to cure, because manager's self-dealing (1) defeated "one of the principal purposes of the management agreement, which was to manage the hotel in the best interests of the owner and to be honest and forthright in its dealings" and (2) "violate[d] the relationship of trust necessarily underlying" the agreement).

"address [Express Scripts'] accusation" that it waived copayments. This is nonsense. What was OmniPlus going to "address"? The fact that, months before filing this lawsuit, OmniPlus knew that it did not even have a mechanism in place to accurately account for copayment collection? SUMF ¶¶ 39-40. The fact that, at the time of the hearing on OmniPlus' motion for injunctive relief, on September 15, 2014, OmniPlus was "going to address" this problem? Doc. No. 29 at 74:1-20. The fact that, to this day, OmniPlus still lacks the capability "to track who has paid [a copayment] and who has an account balance"? SUMF ¶ 39.

Nothing was going to change. Nothing could have changed. Nothing has changed.

Against this backdrop, OmniPlus clings to a purported right to a "review and formal, though ***non-binding***, recommendation from" Express Scripts. *See id.* ¶ 12 (emphasis added). Again, nonsense. A nonbinding review was futile, and thus none was required. *See Stacey*, 226 S.W.3d at 918-19, and cases cited therein. This is doubly true where, as here, OmniPlus' widespread failures under the parties' contract – known to OmniPlus months before it was terminated – constituted an unequivocal waiver of any such perceived right. *See Rosenbloom v. N.Y. Life Ins. Co.*, 163 F.2d 1, 4-5 (8th Cir. 1947) (applying Missouri law; collecting cases) ("There can be no serious dispute as to the applicable rule of law. That rule is that a party is not required to do a useless, futile act. More narrowly and pertinently stated, it is that where failure of a party to perform a condition is induced by a manifestation to him by the other party that he will not substantially perform his own promise, performance of such condition is waived, and, therefore, excused."); *accord Cooper v. Mayer*, 312 S.W.2d 127, 130 (Mo. 1958) (same; noting that the "[t]he courts of Missouri [have] unanimously announce[d] th[is] rule"). OmniPlus sealed its fate months before it was terminated and OmniPlus knew it. A non-binding appeal

would have changed nothing and OmniPlus knew it.  Express Scripts was under no obligation to indulge OmniPlus with an empty formality.

## CONCLUSION

This case presents a simple issue for summary judgment:  did Express Scripts have the right to end its contractual relationship with OmniPlus?  The Contract here was at will, and Express Scripts had the right to immediately terminate the Contract if Express Scripts received information from members that OmniPlus was undermining copayments by offering to waive, waiving, or failing to collect them.  Express Scripts received several member statements indicating that OmniPlus was offering to waive and waiving copayments.  That, in and of itself, is a basis for immediate termination.  But here there is much more.  The undisputed evidence establishes multiple separate and independent reasons – from the 6,341 member copayments that OmniPlus failed to collect, to OmniPlus' misrepresentation on the Provider Certification – that would give rise to immediate termination.  OmniPlus has conceded its breach.  OmniPlus' only argument for why this case should continue is a Texas Regulatory Addendum to the Contract that does not apply.  The Court should grant summary judgment to Express Scripts on all of OmniPlus' claims.

SLC-7728993

Dated:  December 7, 2015                    **HUSCH BLACKWELL LLP**


By: ____/s/ Kyle P. Seelbach_____

    Kyle P. Seelbach, #60382MO
    Sarah C. Hellmann, #50373MO
    Jason Husgen, #66761MO
    190 Carondelet Plaza, Suite 600
    St. Louis, MO  63105
    (314) 480-1500 Telephone
    (314) 480-1505 Facsimile
    kyle.seelbach@huschblackwell.com
    sarah.hellmann@huschblackwell.com
    jason.husgen@huschblackwell.com

*Attorneys for Defendants Express Scripts, Inc. and Medco Health Solutions, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was filed electronically via the Court's CM/ECF system, on this 7th day of December, 2015, and served via the Court's electronic case filing system upon the following attorneys of record:

Douglas W. King
Erin M. Leach
SHANDS, ELBERT, GIANOLAKIS &
GILJUM, LLP
1 North Brentwood Blvd., Suite 800
St. Louis, MO 63105

**Counsel for Plaintiff**

/s/ Kyle P. Seelbach

SLC-7728993