UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ALTERNATIVE MEDICINE | ) | |
| AND PHARMACY, INC. d/b/a | ) | |
| OMNIPLUS PHARMACY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:14-cv-01469-CDP |
| | ) | |
| EXPRESS SCRIPTS, INC. | ) | |
| and MEDCO HEALTH SERVICES | ) | |
| INC., | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT ON THEIR BREACH OF CONTRACT COUNTERCLAIM**

In their motion for summary judgment, Defendants contend that OmniPlus breached the

parties' contract and that Defendants incurred damages.  OmniPlus submits that the undisputed

facts and the law compel just the opposite conclusion, as explained below.

**INTRODUCTION**

Despite the complexity of this case and the magnitude of the dollar amount at issue,

disposition of Defendants' counterclaim is simple.  Under the contract between the parties (made

up of the Express Scripts, Inc. Pharmacy Provider Agreement ("Provider Agreement") and the

Express Scripts Network Provider Manual ("Provider Manual")), Defendants agreed to

reimburse OmniPlus for each of the prescriptions OmniPlus provided to eligible Express Scripts

patients.  Now, Defendants seek to reverse these payments and to recoup the amounts paid to

OmniPlus, even though OmniPlus provided the medications to their insureds in compliance with

the terms of the Provider Agreement and the Provider Manual. Their justification for seeking this

reversal – that OmniPlus failed to collect all copayments – defies logic and is without basis in the

contract between the parties.  Additionally, Defendants suffered no financial damage as a result of the OmniPlus's alleged failure to collect copayments (which amounts OmniPlus was entitled to retain) because Defendants were merely intermediaries who were fully reimbursed by third-party payors for all amounts paid to OmniPlus.

The relationship between the parties began in 2011 and continued until OmniPlus was finally terminated from Defendants' network in October 2014.  Defendants acted as the pharmacy benefits manager ("PBM") for the relationships between OmniPlus and the health insurance and other benefit plans managed by Defendants.  Pl. Addt'l. Facts ¶ 1.  OmniPlus filled prescriptions for individuals who are insured by plans in Defendants' network and submitted claims to Defendants, in their capacity as a PBM, for reimbursement of a portion of each prescription.  Pl. Addt'l. Facts ¶ 2.   The reimbursement amount was determined by Defendants.  *Id.*

On or about July 31, 2014, Defendants notified OmniPlus that it would no longer be in their network, effective September 1, 2014, and cited as cause for the termination the allegation that OmniPlus had failed to disclose in response to a recent re-credentialing questionnaire that it waived or discounted copayments.  Pl. Addt'l. Facts ¶ 3.  Despite OmniPlus's protest as to the lack of factual basis for that allegation, and despite its request for a hearing, Defendants terminated OmniPlus from their network for the stated reason of waiver/discounting of copayments.  Pl. Addt.'l Facts ¶ 4.  This alleged justification was based wholly or in substantial part on a patient survey, in which of the twenty-two patients who were surveyed, three supposedly gave answers that caused Defendants to believe there was a possibility of waiver or discounting.  Pl. Addt'l. Facts¶  5.  On August 25, 2014, OmniPlus filed this case for wrongful termination of the parties' contract.  Pl. Addt'l Facts ¶ 6; Doc. #1.

2

After suit was filed, Defendants began to downplay the contention that OmniPlus waived or discounted copayments and have asserted instead that OmniPlus failed to collect all of the copayments that were due to OmniPlus, and they maintain that this serves as retroactive justification for termination from Defendants' network.  *See, e.g.*, Doc. #86 at 2 ¶1; Doc. #82 at 1 ¶ 2.  On May 14, 2015, Defendants filed their Counterclaim, seeking damages for "Express Scripts' payment of claims submitted by OmniPlus in breach of the parties' agreement, by virtue of OmniPlus's failure to collect copayments on those claims."  Doc. #74-1, p. 15 ¶ 37; Pl. Addt'l Facts ¶ 9.

## ARGUMENT

Defendants' motion for summary judgment relies on two points, neither of which has any merit.  Defendants' first argument is that OmniPlus has admitted all of the elements of its counterclaim by not filing a reply to the counterclaim.  This point is no longer true and is moot because OmniPlus has since filed, with leave of Court, its reply to the counterclaim denying Defendants' allegations (*see* Docs. ##122 & 123).

Defendants' second contention is that it is undisputed that OmniPlus did not collect all copayments and that OmniPlus received approximately $25,801,707.10 from Express Scripts (Doc. #101, p. 9).  Defendants therefore conclude that they have proven all of the elements of their breach of contract claim.  As explained below, the contract does not entitle Defendants to recoup money from OmniPlus based on insufficient copayment collection (§I, below) and, in any event, Defendants have suffered no actual damages (§II, below).

**I.    Defendants Fail to Demonstrate Any Breach of Contract That Would Entitle Them to Recoup the Amounts Paid to OmniPlus.**

Defendants cite and selectively quote several provisions of the Provider Agreement and the Provider Manual in their counterclaim, alleging that OmniPlus was in breach of one or more

of those sections.  Doc. #101, pp. 3-4.  At the outset, it should be noted that the Provider

Agreement and Provider Manual are clearly contracts of adhesion, as opposed to negotiated

contracts.  *See Manfredi v. Blue Cross and Blue Shield of Kansas City*, 340 S.W.3d 126, 132-33

& n.8 (Mo. banc 2011) (provider agreement between healthcare provider and insurer was a

contract of adhesion in that it was a standardized form offered on a take-it-or-leave it basis and

there was a large disparity in bargaining power between the parties).  As such, the contract must

be construed in accordance with the reasonable expectations of the parties.  *Id.* at 134; *Hartland*

*Computer Leasing Corp. Inc. v. Insurance Man, Inc.*, 770 S.W.2d 525, 527 (Mo.App. E.D. 1989)

("the courts seek to enforce the reasonable expectations of the parties garnered not only from the

words of a standardized form imposed by its proponent, but from the totality of the

circumstances surrounding the transaction").

It is well-settled that courts are to construe contracts in a manner that provides

"reasonable meaning to each term" and that does not render provisions "without function or

sense."  *Young v. Flagstar Bank, F.S.B.*, 2014 WL 3809205, at *3 (W.D. Mo. Aug. 1, 2014);

*DeJong v. Sioux Center, Iowa*, 168 F.3d 1115, 1120 (8th Cir. 1999).  Contract interpretation

requires that the agreement be read as a whole and that effect be given to every term, rather than

only the terms that are favorable to the claimant.  *See Young*, at *2; *Pinnacle Pizza Co., Inc. v.*

*Little Caesar Enterprises, Inc.*, 560 F.Supp.2d 786, 800 (D.S.D. 2008).[1]  Rather than rely on the

allegations of the counterclaim as to how to construe the parties' agreement, it is the Court's

function to interpret the contract itself.  *See Merit Group, LLC v. Sint Maarten Intern.*

---

[1] Courts have made clear that in a contract interpretation dispute, the parties cannot cherry-pick
language that is favorable to them.  *See, e.g., Staley v. Computer Sciences Corp.*, No. 3:13-CV-
00280-MGL, 2014 WL 6473703, at *2 (D.S.C. Nov. 18, 2014);  *Union Pac. R. Co. v. Cedar*
*Rapids and Iowa City R. Co.*, 477 F. Supp.2d 980, 1001-02 (N.D. Iowa 2007).

*Telecommun. Services, NV*, No. 08-CV-3496(GBD) 2009 WL 3053739, at *2 (S.D.N.Y. Sept. 24, 2009).

Upon review of the cited sections in their entirety and in context, it is clear that OmniPlus' conduct does not constitute a breach of the parties' contract that would entitle Defendants to force OmniPlus to pay back everything it received for the prescriptions it filled. Defendants first rely on Section 3.1 of the Provider Agreement and state that Express Scripts "may refuse to pay any claim or may reverse payment of any claim that is not submitted in accordance with the terms and conditions of this Agreement." Doc. #101, p. 3. Relying on this provision is fatal to Defendants' counterclaim because there is no allegation by Defendants that they refused to pay or attempted to reverse payment of any claim at any time during the parties' relationship or in their stated reasons for the termination. Pl. Addt'l. Facts ¶ 7; Klein Depo. at 92-95; Roberts Depo. at 84-85.

Defendants also allege that OmniPlus has breached the contract between the parties simply by "not collecting copayments." Doc. #101, pp. 3-4. Defendants allege that the Provider Agreement "required that OmniPlus shall collect from Members . . . the applicable Copayment" and that the Provider Manual "makes clear that copayments are to be collected." Doc #74-1 at 12-13 ¶ 23 (internal quotation marks omitted); Doc. #101, p.3. It is undisputed that OmniPlus informed its patients of copayments and that it sent invoices for the copayment amount to its patients with their medication. Pl. Addt'l Facts ¶ 8. It is also undisputed that OmniPlus did collect many of the copayments owed to it. Pl. Addt'l. Facts ¶ 9. Defendants cannot construe OmniPlus's conduct as a breach of the contract between the parties simply because they are not satisfied with the particular copayment collection efforts employed by OmniPlus.

5

Copayment collection efforts are addressed in a separate part of the contract from the recoupment and penalty provisions under which Defendants seek relief.  The cited provision of the Provider Agreement does not say that Express Scripts or Medco may refuse to pay claims or recoup payments if OmniPlus has not collected a copayment.  The full language and context of paragraph 3.1(a) of the Provider Agreement (Pl. Addt'l Facts ¶ 12) is as follows (emphasis added):

> **<u>Payment for Covered Medications</u>**.  For services performed in accordance with the terms and conditions of this Agreement, ESI shall pay Provider the rates as set forth in the applicable rate sheet(s), attached hereto and incorporated herein by this reference, less the applicable Copayment.  Except for Copayments, Provider shall look solely to ESI for payment for Covered Medications and other covered services provided to Members pursuant to this Agreement and not to Sponsor.  Approved claims for Covered Medications shall be paid in accordance with federal or state law and the Provider Manual. Additional information or rejected or disputed claims must be submitted or resubmitted, as applicable, by Provider within thirty (30) days of the request for additional information, initial rejection or dispute.  ESI may deny payment for any claim not ***submitted*** within this time period.  Further, ESI may refuse to pay any claim or may reverse payment of any claim that is not ***submitted*** in accordance with the terms and conditions of this Agreement.

The operative verb here is "submitted."  The submission of a claim is a procedural step which must necessarily occur prior to any potential collection of a copayment.  Defendants do not even allege that OmniPlus failed to comply with the claim submission procedures at any point during the parties' relationship.  Pl. Addt'l Facts ¶ 13.  At the time of submission of a claim, it was impossible for OmniPlus to have collected any copayment because it is only through the response that OmniPlus gets *after* submitting a claim that Express Scripts or Medco informs OmniPlus of the copayment amount required by the particular patient's insurance for a specific prescription.  Pl. Addt'l Facts ¶ 18.  In sum, there is no way that Section 3.1 can be

6

reasonably interpreted to permit Express Scripts to recoup amounts paid to OmniPlus based on insufficient copayment collection.

Likewise, Defendants' reliance on Section 5.3 of the Provider Manual is unavailing in their attempt to show a breach of contract.  Section 5.3 is similar to Section 3.1 of the Provider Agreement in that it allows Express Scripts and Medco to withhold payment where claims are not "submitted" properly.  The motion relies on (Doc. #102 ¶8) the following selective quotation from Section 5.3 of the Provider Manual that is modified with bracketed language (quoting Doc. #78, ¶30(ii)):

> Section 5.3 of the Provider Manual effective July 2014 states that "[c]laims not submitted in accordance with [the Provider Agreement and the Provider Manual] are subject to reversal and recoupment of paid claims."

Read as a whole, Section 5.3 clearly relates to cooperation in facilitating audits rather than the procedure for submitting claims or the collection of copayments.  The actual text of Section 5.3 concerning "Audit Guidelines," together with the preceding and succeeding paragraphs, reads as follows:

> **Appeal Documentation**:  In general, Network Provider may provide any legally valid prescription to validate an audited claim.  If Network Provider is unable to produce a complete prescription (i.e., missing directions sufficient to calculate days supply) or any other required documentation during an On-Site or within the timing required by the Desk Audit, Network Provider will be required to submit Prescriber generated documentation.  <u>No Network Provider generated documentation will be accepted</u>.  (Examples of Network Provider generated documentation include emails from Prescribers, Network Provider generated copies, telephone prescriptions and Network Provider generated faxed refill requests or other prescription forms).
>
> Prescriber generated documentation includes:  (i) photocopies of the original Prescriber generated prescriptions (if found) – original Prescriber generated prescriptions must be dated and, if

a fax, must have a header identifying the Prescriber and the original fax date; or (ii) an original letter on Prescriber's letterhead or on a Prescriber's prescription blank that includes all information needed on a valid prescription (including specific directions).  Electronic prescriptions and electronically transferred prescriptions may be accepted as Prescriber generated documentation as long as all relevant dispensing information is included.  PBM will not review appeals filed by Network Provider if the appeal does not comply with these guidelines. Network Provider may contact the auditor conducting the review for additional guidance on appropriate appeal documentation.

**Recoupment and Offset**:  PBM reviews all audit documentation to ensure Covered Medications are dispensed in accordance with all laws, rules, regulations, the Provider Agreement, the Provider Manual, and Payer Sheets.  Claims not submitted in accordance with these requirements are subject to reversal and recoupment of paid claims.

**Federal or State Law**:  In the processing and dispensing of prescriptions, Network Provider must comply with all state and federal prescription documentation and dispensing laws, rules and regulations.  Violations are subject to audit and reversal, and recoupment of paid claims.

Pl. Addt'l Facts ¶ 14.

When Section 5.3 is read in context, without being rewritten by defense counsel, it is clear that this provision relates to auditing for valid prescriptions and proper documentation to authorize the dispensing of prescription medications.  Defense counsel cut out the reference in the Recoupment and Offset paragraph to claims not submitted in accordance with "these requirements" and replaced it with "the Provider Agreement and Provider Manual," but the actual language of "these requirements" plainly refers to the earlier statement that Express Scripts and Medco audit documentation to ensure that medications are "dispensed in accordance with all laws, rules, regulations" as well as the Provider Agreement and Provider Manual.

Thus, Section 5.3 does not authorize reversing or recouping payments for *anything and everything* that Express Scripts or Medco contends is a violation of the Provider Agreement or Provider Manual but only for lack of documentation, upon audit, of proper prescriptions for OmniPlus to dispense medications.  To construe section 5.3 otherwise would be contrary to the plain, ordinary, and usual meaning of the contract read as a whole, and contrary to OmniPlus' reasonable expectations.  There is no contention in this case that Defendants conducted an audit, or that OmniPlus refused to supply proper documentation.  In fact, in all instances where Express Scripts requested prescription information, OmniPlus provided all requested documentation as required.  *See, e.g.*, Pl. Addt'l Facts ¶ 15-16.  Therefore, Defendants' contention that Section 5.3 somehow entitles it to recoup payments from OmniPlus is wrong.

Likewise, there is no support for Defendants' attempt to impose an "enforcement fee" under Section 5.1 of the Provider Manual.  Defendants' interpretation is based on sleight-of-hand in its presentation to the Court.  They would have the Court believe that Section 5.1 awards them an additional 15 percent for anything that they care to claim as "non-compliance" with the contract.  The actual language of the "non-compliance" paragraph is much more specific:

> A Network Provider shall be deemed noncompliant when the Network Provider refuses to allow or cooperate with an audit and/or investigation, fails to provide PBM with the requested documentation, fails to prepare for an audit or investigation, or is otherwise uncooperative, abusive or violates any terms of the Provider Agreement, including this Provider Manual.  If Network Provider (or any employee of Network Provider) is deemed non-compliant, an enforcement fee of $2,000 or 15% of the total final audit or investigation findings, whichever is greater, may be assessed.  Non-compliance fees are in addition to any discrepancies identified.  It is within PBM's sole discretion to recoup 100% of the amount for the paid claims in question and offset any amount owed to Network Provider.  PBM, in its sole discretion, may take further action up to and including termination of Network Provider for non-compliance.

9

Pl. Addt'l. Facts ¶

The 15 percent "enforcement fee" (or penalty) generally relates to non-compliance with an audit if, for example, OmniPlus refused to allow auditors from Express Scripts or Medco to come to its offices or refused to provide documentation requested in such an audit.  Section 5.1 does not state or imply that an alleged failure to collect copayments constitutes non-compliance within the meaning of this provision.  Defendants do not allege that Express Scripts or Medco conducted an audit or asked to come to OmniPlus or did not receive any prescription records requested from OmniPlus.  Section 5.1 is irrelevant to Defendants' counterclaim.

The plain, usual and ordinary meaning of each and every one of the contractual provisions cited in Defendants' counterclaim, as well as OmniPlus's reasonable expectations, make clear that the situation which Defendants complain of in their counterclaim, namely OmniPlus's insufficient collection of copayments, does not rise to the level of a breach of the parties' contract and, in any event, does not trigger any of the cited provisions entitling Defendants to recoup any money from OmniPlus.  Defendants cannot establish an essential element of their counterclaim — breach — and it must therefore fail as a matter of law.

## II.     Defendants Cannot Prove that They Incurred Any Actual Damages Given that They Undisputedly Have Been Fully Reimbursed by Third-Party Payors and OmniPlus Undisputedly Filled the Contracted-For Prescriptions.

Defendants fail to explain how OmniPlus received any "ill-gotten gains" as they suggest.  OmniPlus provided all prescriptions in exchange for the prices as determined by Defendants and thus both sides received the benefit of their bargain.  Pl. Addt'l Facts ¶ 2.  More significantly, Defendants have failed to show that they suffered any financial loss as a result of the alleged breach of contract.  Express Scripts and Medco have acknowledged that they are mere pass-through entities or "intermediaries" and that health plans and employers are the "third-party

payors" who actually pay for the prescriptions that OmniPlus provides.  Pl. Addt'l Facts ¶ 19.

The nature of their business model is that they make payments to pharmacies and then make a

profit on the reimbursement from their health insurance, benefit plan, and employer clients.  Pl.

Addt'l Facts ¶¶ 2, 19-20; s*ee generally* BRIEFING BOOK ON KEY PBM ISSUES*, prepared for James*

*I. Singer, Issue Chair, PBM Compensation and Fee Disclosure,* ERISA Advisory Council, US

Dept. of Labor, at 6, 86-87, 101-104 (July 18, 2014) (excerpts attached as an appendix hereto for

the Court's convenience).

Summary judgment is appropriate where, as here, the claimant cannot show that it was

damaged.  *Benton House, LLC v. Cook & Younts Ins. Inc.*, 249 S.W.3d 878, 881 (Mo. App. W.D.

2008); *Hospital Products, Inc. v. Sterile Design, Inc.*, 734 F. Supp. 896, 907 (E.D. Mo. 1990).

"The mere breach of a contract which causes no loss to the plaintiff will not sustain a suit by him

for damages."  *Gilomen v. Southwest Missouri Truck Center, Inc.*, 737 S.W.2d  499, 501 (Mo.

App. S. D. 1987).  This is because the purpose of breach of contract actions is to place the non-

breaching party in the position he would have been in had the breach never occurred.  *See AAA*

*Uniform and Linen Supply, Inc. v. Barefoot, Inc.*, 81 S.W.3d 133, 138 (Mo. App. W.D. 2002).

The facts of this case show that Defendants are already, and at all times have been, in the same

position with or without OmniPlus's alleged breach.  Pleading or alleging bare assertions of

damage, as Defendants have done, is wholly insufficient to overcome this inadequacy.  *See Scher*

*v. Sindel*, 837 S.W.2d 350, 354 (Mo. App. E.D. 1992).  The only legal authority Defendants cite

in support of these contentions is *Keveney v. Mo. Military Academy*, 304 S.W.3d 98, 104 (Mo.

banc 2010), which simply sets forth the essential elements of a breach of contract claim:  (1) the

existence of a contract; (2) that Defendants performed their contractual obligations; (3) that

OmniPlus breached their obligations; and (4) that Express Scripts suffered damages as a result of

the breach.  Moreover, *Keveney* was an employment law case and did not involve any issue

regarding the third and fourth elements, which are the two elements that Defendants cannot

prove here.

   As this Court and other courts have routinely recognized, evidence that the plaintiff was

entitled to, and in fact received, reimbursement from other sources for its claimed damages is

directly relevant to the plaintiff's ability or inability to prove damages in a breach of contract

case.  *Foam Supplies, Inc. v. Dow Chemical Co.*, 2008 WL 3159598, *3 (E.D.Mo. Aug. 4, 2008)

(recognizing as relevant the extent to which a breach of contract plaintiff may have "passed

along the entire cost" of its claimed damages to its customers and therefore may not have

actually lost any money); *Skepnek v. Roper & Twardowsky, LLC*, 2015 WL 4496301, *27 (D.

Kan. July 23, 2015) (granting summary judgment to defendants on breach of contract claim

where claimants failed to prove that they had suffered any damage in light of evidence that they

were supposed to have received reimbursement from a settlement fund for all of their claimed

damages; claimants did not "identify or even assert that this recovery did not compensate them

fully for any expenses they incurred"); *Garofalo v. Empire Blue Cross and Blue Shield*, 67

F.Supp.2d 343, 346-47 (S.D.N.Y. 1999) (class action plaintiff could not bring breach of contract

claim for refund of paid overcharges where "her entire bill was subsequently reimbursed under

another health insurance plan . . . so that she suffered no actual out-of-pocket loss," noting that

the collateral source rule does not apply in breach of contract cases); *see also Daniel

Construction Company v. International Union of Operating Engineers*, 570 F.Supp. 299, 303

(E.D. Mo. 1983) (collateral source rule, which provides that money received by the plaintiff from

another source should not be considered in assessing damages, "simply is not applicable to

breach of contract cases").

In the present case, Defendants simply have no evidence that they were actually damaged at all by OmniPlus's alleged low copayment collection rate, or that OmniPlus's alleged conduct has cost Defendants a penny.  Defendants' supplemental interrogatory responses, which they served on December 28, 2015, confirm that they received $26,758,341 in reimbursement from their clients for amounts they paid to OmniPlus for claims for which no copayments were collected.  Pl. Addt'l Facts ¶ 22.  Such amount *exceeds* the $25,801,707 which Defendants claim in this motion as out-of-pocket damages.

Furthermore, even if all of the supposed facts stated in Defendants' supplemental interrogatory responses were before the Court on this motion and were uncontroverted (which they are not), such facts would fail to prove any damages.  In their supplemental interrogatory responses, Defendants state that "[i]t appears that OmniPlus actually received approximately $27,052,930 in reimbursement from Express Scripts for such claims [for which no copayments were collected]; Express Scripts received approximately $26,758,341 in reimbursement for such claims, or about 98.2% of the amount that Express Scripts reimbursed OmniPlus for such claims."[2]  The supplemental interrogatory responses further state that Express Scripts "estimates in good faith" that it received reimbursement for 98.2% of the amount it claims as out-of-pocket damages.  However, Defendants do not identify the particular claims for which they supposedly did not receive reimbursement, nor do they explain why no such reimbursement was received and they certainly do not state that they were not entitled to such reimbursement from their clients.  Indeed, it would be quite a poor business model if Defendants, as intermediaries, could

---

[2] As a matter of mathematical correctness, even if one were to assume that Defendants' dollar figures were correct, the actual percentage of reimbursed amounts would be 98.9%, not 98.2% as stated by Defendants ($26,758,341/$27,052,930 = 98.9%).

not collect at least as much from their clients as the amount they had to pay for the prescriptions and consequently were losing money on their services.

Grasping for a way to somehow still claim damages, Defendants' supplemental interrogatory responses go so far as to suggest Defendants "intend" to return to their clients any money they obtain from OmniPlus.  Even if this were true, such intention, in the absence of any legal obligation to do so, is obviously insufficient to enable Defendants to demonstrate that they have suffered any damage.  In sum, Defendants' supplemental interrogatory responses confirm that they cannot prove their claimed damages.

Defendants try to avoid their failure to show damages by praying for an additional 15% of their claimed damages pursuant to Section 5.1 of the Provider Manual.  Even if this provision were applicable here (which it is not, *see* §I, above), it would constitute an unenforceable penalty here given the lack of any actual damages.  *See, e.g.*, *Diffley v. Royal Papers, Inc.*, 948 S.W.2d 244, 247 (Mo. App. E.D. 1997) (finding a fee charging 10% of the contributions due under a contract to be an unenforceable penalty provision because the amount of the penalty was far more than the actual loss incurred); *Monsanto Co. v. McFarling*, 363 F.3d 1336 (Fed. Cir. 2004) (applying Missouri law) (holding a 120 multiplier in the parties' contract to be unenforceable because it was not a reasonable estimation of the harm that would be suffered); *Phillips v. Missouri TLC, LLC*, 468 S.W.3d 398, 407-08 (Mo.App. S.D. 2015) ("without evidence of damages, a liquidated damages clause actually becomes a penalty and is unenforceable").  In the absence of damage to Defendants, their request for a penalty is without any basis in law.

As explained above, Defendants have not shown, and indeed they cannot show, that they were damaged in any way by OmniPlus's alleged conduct.  They are not out any money for the amounts they paid to OmniPlus for prescriptions, because they were admittedly reimbursed by

14

third-party payors.  Pl. Addt'l Facts ¶ 22.  They are not out any money for any copayments that were allegedly not collected, because copayments are revenue due to OmniPlus, not to Express Scripts or Medco.  Because the damage element of their counterclaim cannot be shown, OmniPlus is entitled to judgment as a matter of law.

## CONCLUSION

In sum, the undisputed facts and specific contract provisions demonstrate that OmniPlus did not commit any breach of contract which would entitle Defendants to recoup money from OmniPlus.  Furthermore, granting Defendants the relief they seek would produce an absurd result – money damages to a party that cannot prove that it suffered any financial loss, and even though that party received the benefit of the bargain under its contract, in this case, the distribution of medications to patients in its network.  For all of these reasons, Defendants' motion for summary judgment on their counterclaim should be denied.

Respectfully submitted,

SHANDS, ELBERT, GIANOULAKIS & GILJUM, LLP

*/s/ Douglas W. King*
Douglas W. King 34242 MO
Erin M. Leach 66924 MO
1 North Brentwood Blvd., Suite 800
St. Louis, MO 63105
(314) 241-3963
(314) 241-2509 – Fax
dking@shandselbert.com
eleach@shandselbert.com

Attorneys for Plaintiff

15

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 4th day of January, 2016, a copy of the foregoing was filed with the Court to be served electronically by operation of the Court's CM/ECF system on all counsel of record.


_____ */s/ Douglas W. King* _____