UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ALTERNATIVE MEDICINE | ) | |
| AND PHARMACY, INC. d/b/a | ) | |
| OMNIPLUS PHARMACY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:14-cv-01469-CDP |
| | ) | |
| EXPRESS SCRIPTS, INC. | ) | |
| and MEDCO HEALTH SERVICES | ) | |
| INC., | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT ON THE MERITS OF PLAINTIFF'S CLAIMS**

In their motion for summary judgment, Defendants Express Scripts, Inc. ("Express

Scripts") and Medco Health Services, Inc. ("Medco") (collectively "Defendants" or "ESI")

attempt to persuade the Court that Defendants did not breach the contract, that it was instead

OmniPlus that failed to perform its contractual obligations, and that Defendants were entitled to

terminate OmniPlus from their network.  In sum, Defendants claim that this case "boils down to

whether Express Scripts had the right to immediately terminate the parties' contract."  On that

point, the parties agree.  However, Defendants cannot demonstrate that ESI had such right.

**INTRODUCTION**

Throughout their relationship, in accordance with the contract (made up of the Express

Scripts, Inc. Pharmacy Provider Agreement ("Provider Agreement") and the Express Scripts

Network Provider Manual ("Provider Manual")), OmniPlus provided medications to patients on

behalf of Defendants' clients and charged Defendants and patients (through copayments) for the

medications at prices determined by Defendants.  Pl. Addt'l Facts ¶¶ 2, 9-12, 20.

On July 31, 2014, Defendants informed OmniPlus that it was being terminated for "waiver/reduction" of copayments.  Doc. #1-4 (termination letter); Pl. Addt'l Facts ¶ 3.  As it turns out, however, Defendants have no evidence of any waiving or discounting[1] of copayments.  So Defendants have attempted to modify their stated reason for immediate termination, now contending that OmniPlus's failure to collect all copayments constitutes sufficient justification for terminating OmniPlus from Defendants' network.

Defendants are correct that OmniPlus did not collect all copayments due to it.  However, Defendants are wrong that this constituted a breach of the contract.  Defendants' contention is fundamentally flawed because, though the contract contains prohibitions on waiver and reduction of copayments and though it contains over two hundred pages of other requirements and obligations that Defendants imposed on pharmacies, it does not require that all or even a certain percentage of copayments be collected, and it does not specify what copayment collection procedures must be undertaken by a pharmacy.  Pl. Addt'l Facts ¶ 13.

Despite OmniPlus's adherence to the terms of the contract, ESI made a decision to terminate OmniPlus from its network as of September 1, 2014, and executed that decision in October 2014. Doc. #1-4 (termination letter); Pl. Addt'l Fact ¶¶ 1, 3.  That termination was not proper under the contract for at least five reasons: (1) Defendants cannot prove that they had a valid reason for terminating the contract or that they complied with the proper termination notice and hearing procedure required by the contract; (2) the contract could have required specific copayment collection practices but it did not; (3) OmniPlus's failure to collect all copayments

---

[1]  The termination letter used the language "waiver/reduction" as justification for termination. Doc. #1-4 (termination letter).  However the word "discount" is also used in certain places in the contract (*see, e.g.*, Doc. #104-5 at 13 ¶ 2.2 (excerpt of Provider Manual) and Doc. #104-2 at 3 ¶ 2.4.a (Provider Agreement)), and has also been used in Defendants' pleadings (*see, e.g.*, Doc. #78-1 at 12 (Counterclaim)).  Consequently, this memorandum will use and analyze all three terms.

does not constitute waiver or reduction; (4) there is no admissible evidence that any copayment was ever waived or discounted; and (5) OmniPlus has complied with all of its contractual obligations; and.   For these reasons, explained in more detail below, Defendants' motion for summary judgment should be denied.

## FACTS

The relationship between the parties began in 2011 and continued until OmniPlus was finally terminated from Defendants' network in October 2014.  During that period, Defendants acted as the pharmacy benefits manager ("PBM") for the relationships between OmniPlus and the health insurance and other benefit plans managed by Defendants.  Pl. Addt'l. Facts ¶ 1. OmniPlus filled prescriptions for individuals who are insured by plans in Defendants' network and submitted claims to Defendants, in their capacity as a PBM, for reimbursement.  *Id.* ¶ 2.  The reimbursement amount was determined by Defendants.  *Id.*

On or about July 31, 2014, Defendants notified OmniPlus that it would no longer be in their network, effective September 1, 2014, and cited as cause for the termination the allegation that OmniPlus had failed to disclose in response to a recent re-credentialing questionnaire that it waived or reduced copayments.  *Id.* ¶ 3.  Despite OmniPlus's protest as to the lack of factual basis for that allegation, and despite its request for a hearing, Defendants terminated OmniPlus from their network for the stated reason of waiver/reduction of copayments.  *Id.* ¶ 4.  This alleged justification was based wholly or in substantial part on a patient survey, in which of the twenty-two patients who were surveyed, four supposedly gave answers that caused Defendants to believe there was a possibility of waiver or discounting.  *Id.*¶ 5.  OmniPlus filed this case for wrongful termination of the parties' contract on August 25, 2014.  *Id.* ¶ 6; Doc. #1 (Complaint).

3

Since this lawsuit was filed, Defendants began to downplay the contention that OmniPlus waived or reduced copayments and have asserted instead that OmniPlus *failed to collect* all of the copayments that were due to OmniPlus; they maintain that this serves as retroactive justification for termination from Defendants' network. *See Alternative Med. & Pharmacy, Inc. v. Express Scripts, Inc.*, No. 4:14 CV 1469 CDP, 2014 WL 4988199, at *5 (E.D. Mo. Oct. 7, 2014) ("For the first time at the hearing, Express Scripts argued that the failure to collect a copayment amounts to a waiver or discount of a copayment."); *see, e.g.*, Doc. #86 at 2 ¶1 (Memo in Support of Defs. Mtn. to Compel); Doc. #82 at 1 ¶ 2 (Memo in Opp. of Pls. Mtn. to Dismiss); Doc. #111 at 15 (Memo in Sup. of Defs. MSJ).  The change in Defendants' theory is explained in part because discovery has revealed that OmniPlus did not in fact waive or discount copayments. Pl. Addt'l Facts ¶ 7.  Discovery has also revealed that, while OmniPlus did not collect all patient copayments, it did collect many of the copayments owed to it.  *Id.* ¶ 8.

The typical process used by OmniPlus to collect copayments was as follows:  (1)  an OmniPlus representative contacted the patient via telephone, informed him or her of the copayment, and asked whether he or she could pay over the phone at that time, (2) the representative received a credit card payment over the phone or OmniPlus placed an invoice in the box with the medication to be shipped if the patient was unable to pay over the phone, (3) OmniPlus established an account receivable for the copayment due, and (4) OmniPlus maintained all accounts receivable and never forgave any such accounts.  *Id.*  ¶¶ 9-11.  At times, OmniPlus would make follow-up phone calls to patients regarding their outstanding balances on copayments owed.  Pl. Response to Defs. Facts ¶ 36; Ex. 1 to Pl. Addt'l Facts at 145.  Unlike retail, walk-in customers (who often have the required copayment noted on their insurance cards) or Tri-Care customers (for whom the copayment was always the same), OmniPlus could not

4

collect a copayment upon its initial contact with customers for whom physicians had sent in prescriptions for compound medications because OmniPlus could not know the required copayment amount until after it had gathered information from the customer and submitted a claim to be adjudicated by Defendants. *Id.* ¶ 12. Through these efforts, OmniPlus received copayment checks almost every day from patients. Doc. #20-3 at 2 ¶ 7 (Dec. of Breimeister).

The contract between the parties is silent on copayment collection efforts. *See* Doc. #104-2 (Provider Agreement); #104-5 (excerpt of Provider Manual). There is no provision in the contract requiring any specific type, magnitude, or scope of collection procedures. Pl. Addt'l Facts ¶ 13. Likewise, there is no question on the Provider Certification regarding copayment collection procedures or efforts. *Id.* ¶ 14. The provisions of the contract discussing copayments do not impose affirmative obligations on OmniPlus to collect all, or even a specified portion of copayments. *Id.* ¶ 13. OmniPlus has not waived or discounted copayments and it has at all relevant times collected or attempted to collect copayments, and therefore it has not violated any copayment obligations under the contract. *Id.* ¶¶ 8-11, 13, 15; Doc. #104-2 at 3 § 2.4.a (Provider Agreement); Doc. #104-5 at 13 § 2.2 (excerpt of Provider Manual). OmniPlus has not breached the contract in any other respect. Pl. Addt'l Facts ¶¶ 16, 17.

## ARGUMENT

**1.     Defendants cannot prove, as they must, that they had a valid reason for terminating OmniPlus or that they followed the required procedure for informing OmniPlus of the reasons for the termination.**

The contract restricts Defendants' right to terminate OmniPlus by requiring Defendants to provide a valid reason and to follow a specific termination procedure, neither of which Defendants did. First, the Provider Agreement and the Project Manual expressly authorized Defendants to immediately terminate OmniPlus from the network only under a certain, narrow

list of circumstances, and it is undisputed that none of these circumstances exists here.  Defs.

Facts ¶¶ 8, 9; Parts 2-5, *infra*.  Second, the Addenda to the Provider Agreement further restrict

Defendants' right to terminate OmniPlus by incorporating by reference all state-specific laws

which apply to contracts between PBMs and pharmacy providers.

The introductory paragraph to the Texas Addendum, for example, specifically states that

"[t]he Provider Agreement is hereby amended, ***as required by and consistent with law***," and

§5.1 of the Addendum requires that the "PBM shall provide a written explanation to Provider of

the reason(s) for termination at least ninety (90) days prior to the effective date of such

termination ***to the extent required by law***."  Doc. #1-3 at 203 (emphasis added) (citing various

sections of Texas's Insurance Code and Administrative Code).  The Addendum further states that

"[i]n the event there is a conflict between the terms and conditions set forth in this Addendum

and the terms and conditions set forth in the Provider Agreement (including the Provider

Manual), the terms and conditions set forth in this Addendum shall control."  *Id.*  Thus, the

parties' contract expressly incorporates all applicable provisions of the Texas Insurance Code

and its administrative regulations.  This incorporation by reference is sufficient to incorporate

into the contract all applicable Texas insurance statutes and regulations.  *See In re Shelton*, 481

B.R. 22, *27-28 (W.D. Mo. 2012) (breach of contract claim was properly based on regulations

incorporated into contract even where no private right of action was provided by regulations

themselves); *Overholt v. Wells Fargo Bank, N.A.*, No. 4:10-CV-618, 2011 WL 4862525, *6

(E.D. Tex. Sept. 2, 2011).

The Texas Insurance Code and Administrative Code require a terminating PBM to

deliver a written explanation of the reasons for the termination of a provider agreement at least

ninety (90) days prior to the effective date of the termination.  Tex. Ins. Code §§ 843.306(a),

1301.057(a); 28 TAC §§ 3.3703(a)(19); 10.42(6)(A), 11.901(5)(A).  The law also requires that the provider receive the opportunity for a formal review conducted by an advisory panel composed of physicians and other providers.  Tex. Ins. Code §§ 843.306(b)-(c), 1301.053; 28 TAC § 3.3706(d).  It is undisputed that Defendants failed to comply with this termination procedure.  Pl. Addt'l Facts ¶¶ 3-4.

Defendants argue that they are exempt from certain aspects of the above-cited Texas law by virtue of their standing as a PBM rather than an HMO or an insurer.[2]  However, Texas law is to the contrary.  A recent Texas Attorney General's Opinion makes clear that Texas Insurance Code §§ 843.306 and 1301.057 apply specifically to the relationship between PBMs and pharmacies and therefore that the notice and review provisions of each of the above-cited statutes and regulations apply to Defendants' treatment of OmniPlus.  *See* Letter from Honorable Ken Paxton, Tex. Att'y Gen., to Honorable Charles Schwertner, Chair, Senate Comm. on Health & Human Servs., Opinion No. KP-0036, at 1-2 (Aug. 14, 2015), attached hereto as an appendix.  The Attorney General's Opinion makes abundantly clear then that the provision of the Texas-specific Addendum requiring ninety days written notice of termination, including notice of an opportunity for review "to the extent required by law," in fact governed the parties' relationship.  Defendants breached the contract by failing to comply with this procedure required by Texas law which was incorporated into the contract.

The last two of Defendants' contentions regarding Texas law can be addressed together.  They claim first that there is a fraud or malfeasance exception under Texas law which would allow for immediate termination, and they claim that because of OmniPlus's alleged

---

[2] This allegation is despite the fact that Texas statutes do not allow an HMO or PPO to delegate around their duties under the law, and therefore PBMs who contract with HMOs, PPOs, and insurers are covered by the law.  Tex. Ins. Code §§ 843.002(30), 1301.109, 1301.0041(a).

7

malfeasance, a review of the situation by Defendants would have been futile.  It is disingenuous for Defendants to claim futility, or that they knew of fraud or malfeasance, when the basis for the termination was four *unsubstantiated* mere *suggestions* of *possible* bad action by OmniPlus.  Pl. Addt'l Facts ¶ 5.  Defendants did not follow up with the members who provided statements, did not interview additional members, and did not give OmniPlus the opportunity to be heard regarding the allegations.  Pl. Addt'l Facts ¶¶ 4, 19.  If they had, the complexities of this case and of copayment collection procedures and the intricacies of the contract provisions discussed above may well have led to a different decision.  Instead, ESI acted immediately and without full information to terminate OmniPlus; such action was in violation of the contract.

Under Texas law, Defendants also must have a valid reason for terminating a pharmacy from its network.  Specifically, Texas's Any Willing Provider ("AWP") statute prohibits PBMs from terminating or otherwise excluding a pharmacy from its network unless the pharmacy has violated a standard term of the contract which the PBM enforces against all of its other pharmacies.  *See*, *e.g.,* Tex. Ins. Code Art. 21.52B § 2(a)(2) ("A health insurance policy or managed care plan . . . may not . . . deny a pharmacy or pharmacist the right to participate as a contract provider under the policy or plan if the pharmacy or pharmacist agrees to provide pharmaceutical services that meet all terms and requirements and to include the same administrative, financial, and professional conditions that apply to pharmacies and pharmacists who have been designated as providers under the policy or plan"); *Texas Pharmacy Association v. Prudential Insurance Company of America*, 907 F.Supp. 1019, 1024, 1026 (W.D. Tex. 1995) (under Texas AWP statute, pharmacy network operator cannot "set and apply whatever criteria it chooses, rejecting qualified pharmacies"; instead, it "must allow participation in its PPO pharmacy network by any pharmacy or pharmacist who meets the standard terms and conditions

8

required of all participating pharmacies"), *aff'd as modified by Texas Pharmacy Association v. Prudential Insurance Company of America*, 105 F.3d 1035 (5th Cir. 1997); *Quality Infusion Care, Inc. v. Humana Health Plan of Texas, Inc.*, 290 Fed. Appx. 671, 681-82 (5th Cir. 2008) (Texas AWP permits claim for discrimination against out-of-network providers and is likely not subject to conflict preemption under ERISA) (citing *Kentucky Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329 (2003)); *Mission Specialty Pharmacy, LLC v. OptumRX, Inc.*, No. SA-15-CV-885-DAE, 2015 WL 9581866, **7-9 (W.D. Tex. Dec. 30, 2015) (Texas AWP statute "prohibits the termination of pharmacies in compliance with the administrative, financial, and professional requirements contained in the agreement between the network and the pharmacy").[3]

Here, Defendants cannot prove that OmniPlus violated any standard terms of the contract which Defendants required of other pharmacies. Thus, Defendants terminated OmniPlus without any reason that was valid under Texas law and without complying with the required Texas procedure, as further set forth below.

## 2. The contract could have required OmniPlus to collect all copayments or a certain percentage of them or could have specified minimum copayment collection procedures, but it did not do so.

Defendants cite two contractual provisions in support of their claim that the contract required OmniPlus to collect copayments. However, review of the full text of these provisions reveals no such requirement. Section 2.4 of the Provider Agreement is titled "Collection of Copayments; Member Hold-Harmless; Violation," and it reads as follows:

> 2.4.a  <u>Copayments</u>.  Provider shall collect from Members the lesser of the Usual and Customary Retail Price amount or the applicable Copayment

---

[3]  Similarly, other states in which OmniPlus dispensed medications have AWP statutes which also limit Defendants' ability to terminate or exclude a pharmacy from their network.  *See, e.g.,* Massachusetts, M.G.L.A. 176D §3B; Virginia, Va. Code §38.2-3407.7; Colorado, C.R.S.A. §10-16-122.

indicated by ESI, or when applicable, the full Copayment when indicated by ESI, through its online processing system or if online processing is unavailable, in accordance with the Provider Manual.  Copayments may not be waived or discounted and, unless directed by ESI in writing, Provider shall not collect any greater amount or other taxes, fees, surcharges, or compensation from any Member for any Covered Medications or services provided in connection therewith.  In no event will ESI be liable for any Copayment.

2.4.b  <u>Member/Sponsor Hold Harmless</u>.    Except  with  respect  to Copayments, Provider shall look solely to ESI for payment for Covered Medications and other covered services provided to Members pursuant to this Agreement, as further set forth in the Provider Manual.

Doc. #104-2 at 3 § 2.4.a-2.4.b.

While Defendants argue that the phrase "Provider shall collect" imposes some affirmative duty on OmniPlus, that phrase is actually used in a limiting manner.  Section 2.4 is in effect a hold harmless provision, the overarching purpose of which is to prevent ESI from being liable to OmniPlus for any copayments.  ("In no event will ESI be liable for any Copayment."; "Provider shall look solely to ESI. . .")  In accomplishing this goal, Section 2.4 limits what OmniPlus can collect from ESI *and from members*.  ("Provider shall collect from Member the lesser of . . ."; "Provider shall not collect any greater amount. . .")  This language directs where OmniPlus is authorized to look for payment for the medications it dispenses – to the member for the copayment and to ESI for the agreed reimbursement amount, and it is far from an imposition of some affirmative obligation on OmniPlus to collect.  Nowhere in Section 2.4 does the language indicate that 100% of copayments must be collected (or even some smaller percentage).  OmniPlus's collection efforts and its collection of a portion of the member copayments is sufficient to comply with the general standard of this section of the contract.

The second provision cited by Defendants on this point is Section 2.2 of the Provider Manual, which they contend requires that OmniPlus "shall collect" all copayments.  In actuality,

10

Section 2.2 (and the substantively identical Section 2.3 from the previous version of the Provider

Manual) simply defines "patient financial responsibility" and gives a narrative account of the

manner in which copayments will be charged:

> PBM defines patient financial responsibility to be the amount of money a Network Provider is to collect from a Member for the provision of Covered Medications. This amount can include Copayment or Coinsurance (a percentage "Copayment"). Sponsors determine the Copayment amounts to be collected. Copayment amounts vary from Sponsor to Sponsor and/or Prescription Drug Program. Network Provider shall ensure that the correct Copayment is charged to the Member and is not changed or waived. Should a Member have a question about his or her Copayment or deductible and benefit limits, please instruct him/her to call the Customer Service number listed on the Member's Identification Card.
>
> Network Provider may not institute Member Copayment discount programs or otherwise alter a Member Copayment, unless such waiver or discount is required by law. If PBM becomes aware of any Copayment or cost-sharing discounts offered by Network Provider – either through audit, investigation, Member statements, or review of Network Provider's website or other advertising materials – Network Provider may be subject to immediate termination. For clarification, if PBM identifies fliers, advertisements, or other statements from Network Provider suggesting that a Copayment will be a flat fee or will be discounted, capped, or waived, Network Provider will be subject to termination.

Doc. #104-5 at 13 § 2.2.  The only affirmative obligations that this provision imposes on

OmniPlus are that it must: (a) "ensure that the correct Copayment is charged to the Member and

is not changed or waived" and (b) "not institute Member Copayment discount programs or

otherwise alter a Member Copayment, unless such waiver or discount is required by law."  *Id.*

By its plain language then, this provision requires that OmniPlus charge copayments and not

change or waive them.  By the uncontroverted evidence, OmniPlus complied with these

requirements.  Pl. Addt'l Facts ¶¶ 5, 7.  OmniPlus has also complied with the second obligation,

11

which is to not distribute "fliers, advertisements, or other statements . . . suggesting that a Copayment will be a flat fee or will be discounted, capped, or waived," and there is no contention otherwise by Defendants.[4]

Defendants stress the plain meaning of the words "shall" and "collect," but they fail to recognize the most fundamental principle of contract interpretation – that the contract is to be interpreted in a manner that is reasonable and which affords meaning to the contract and its provisions as a whole. *DeJong v. Sioux Center, Iowa*, 168 F.3d 1115, 1120 (8th Cir. 1999); *Schnuck Markets, Inc. v. First Data Merchant Data Services Corp.*, 86 F.Supp.3d 1055, 1061 (E.D. Mo. 2015). Certainly, cherry- picking two words from a paragraph-long provision and molding their definitions into an otherwise unstated obligation does not accomplish this goal. *Staley v. Computer Sciences Corp.*, No. 3:13-CV-00280-MGL, 2014 WL 6473703, at *2 (D.S.C. Nov. 18, 2014) ("[A party's] attempts to cherry-pick favorable language without adequate context is unavailing.")

The general rule of *contra proferendem* would require that the contract is interpreted against ESI as the drafter. Restatement (2d) of Contracts § 206 (1981) ("In choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds."). However, even without that rule, a reasonable interpretation of Defendants' silence on specific copayment collection procedures is that the drafter intended it. *See Triarch Industries, Inc. v. Crabtree*, 158 S.W.3d 772, 776 (Mo. banc 2005) ("If the contract is unambiguous, it will be enforced according to its terms. If ambiguous, it will be construed

---

[4] OmniPlus's only policy concerning waiver was in compliance with Medicare requirements. Pl. Addt'l Facts ¶ 17. However, there was never a request for waiver under that policy while OmniPlus was in ESI's network. *Id.*; Exhibit 1 to Pl. Addt'l Facts at 132.

against the drafter, as is the case with other contracts under Missouri Law.") (citing *Keymer v. Mgmt. Recruiters Int'l, Inc.*, 169 F.3d 501, 504 (8th Cir. 1999).

ESI could have explicitly stated in the contract that all copayments must be collected from members.  The contract could have included a threshold percentage of copayment collections required of OmniPlus.  It could have included a timeframe in which copayments were to be collected or required them to be collected before dispensing.  It could have specified the manner in which copayments were to be collected.  It could have laid out particular collection procedures such as second or third notices or referral to collections agencies.  It did none of these things.  Despite Defendants' frequent reminders of how vitally important copayment collection is in the industry, ESI, the drafter of the contract, chose to remain silent on collections practices.[5]

### 3.      Defendants' summary judgment motion is based on the incorrect assumption that inefficient copayment collection is the same as a waiver or reduction of copayments.

Beyond their plainly incorrect assertion that the contract affirmatively requires collection of all copayments, Defendants place much of the focus of their memorandum on OmniPlus's inefficient collection of copayments.  OmniPlus does not dispute that its collection to non-collection ratio has been low.  It is undisputed that OmniPlus's PK software, while efficient and highly-regarded in the industry on prescription administration, is lacking in accounting features that would maximize copayment collection and record keeping.  Defs. Facts ¶ 39.  It is also undisputed that OmniPlus has been making strides toward improving its copayment collection procedures.  *See, e.g.*, Ex. 2 to Pl. Addt'l Facts at 142-143 (excerpt of 30(b)(6) Depo.).  Defendants' rote recitation of the collection percentages and amounts in their Facts ¶¶ 17-26 and

---

[5]  Similarly, the Provider Certification sent by Defendants to OmniPlus in March 2014 could have inquired about copayment collection efforts, but it did not.  Doc. #23-6 (Provider Certification).

their charts in Fact ¶ 27 does not establish a violation of any particular contractual requirement. OmniPlus admits the low collection rates and that it does not insist on payment of each copayment before dispensing the medication.[6]  However, contrary to Defendants' contention, this inefficient collection is not a waiver, reduction, or discount and is therefore not a breach of the contract.

The plain meaning of the terms at issue demonstrate that OmniPlus has at all relevant times been in compliance with the contract.  Waiver means "the act of intentionally relinquishing or abandoning a known right, claim, or privilege; *also*: the legal instrument evidencing such an act."  MERRIAM-WEBSTER DICTIONARY (2015).   To waive an obligation requires a knowing, voluntary action evidencing an intentional relinquishment.  BLACK'S LAW DICTIONARY (10th ed. 2014) ("Ordinarily, to waive a right one must do it knowingly – with knowledge of the relevant facts.").  Reduction means "[t]he action or fact of making a specified thing smaller or less in amount, degree, or size[.]"  OXFORD DICTIONARIES (2015).[7]  To discount is defined as "to make a deduction from usually for cash or prompt payment."  MERRIAM-WEBSTER DICTIONARY (2015).  As illustrated below, none of these definitions describes OmniPlus's actions.

Defendants highlight each and every thing that OmniPlus did not do in its efforts to collect copayments, but they skim over the many things that it did do:  OmniPlus generated an

---

[6]  OmniPlus does, however, collect copayments before dispensing for TRICARE patients because the applicable regulations specifically require pharmacies to do so.  *See* 32 C.F.R. 199.6(a)(13)(iv); Ex. 1 at 82:25-83:24 (excerpt of Milosevic Depo.).  ESI was necessarily aware of these regulations since it administers TRICARE for the Department of Defense.  *See* TRI-CARE link on Express Scripts' homepage, available at: https://www.express-scripts.com/index. html.  ESI could easily have included a similar requirement in its Provider Agreement or Provider Manual, but it chose not to do so, and it cannot now accuse OmniPlus of breaching a requirement that is not in the contract.

[7]  The Oxford Dictionaries definition was used for "reduction" because the Merriam-Webster definition would require two steps, as reduction is defined there as "the act or process of reducing; the state of being reduced."  MERRIAM-WEBSTER DICTIONARY (2015).

invoice for each prescription, contacted each patient by telephone, and indicated to him or her that OmniPlus would be charging them the given amount as a copayment and that OmniPlus expected payment of that amount.  Pl. Addt'l Facts ¶¶ 9, 10; Doc. #114, Ex. 4 (Protocol Regarding Patient Co-Pays Collection).  OmniPlus attempted to collect payment over the phone from many patients, and then sent an invoice containing the copayment amount if the patient could not pay over the telephone.  *Id.*  OmniPlus at times made follow-up phone calls regarding payment.  Pl. Response to Defs. Facts ¶ 36.  Lastly, and most importantly, OmniPlus set up an account receivable for that patient and maintained the patient's account receivable on its accounting books in preparation for payment.  *Id.* ¶ 11.

These efforts to collect copayments certainly cannot amount to waiver, as they evidence the opposite of a "relinquishment" or "abandonment."  Waiver would have required an intentional forgiveness of the copayment amounts owed and manifestation of that action to the patients.   Likewise, inefficient collection does not fit within the definition of reduction or discount; the accounts receivable for each copayment were created and maintained, and no amount due was "made smaller or less," nor were any "deductions" made from the amounts owed.  In fact, even if Defendants' definition of "collect" is applied, requiring actual receipt of payment, OmniPlus's process still meets the contractual requirements – OmniPlus did not waive, reduce, or discount copayments, and it actually received payment for a portion of them.  Pl. Addt'l Facts ¶¶ 7-8.

The reason that the Court must resort to using these dictionary definitions to deduce the contract's plain meaning is that waiver, reduction, and discount are not defined within the contract.  *American Family Mut. Ins., Co v. Van Gerpen.*, 151 F.3d 886, 887-88 (8th Cir. 1998) ("Under Missouri law, we must give terms . . . their plain meaning . . . .  To determine the plain,

layman's meaning of a word, we look to standard English language dictionaries.")  If what ESI meant by "waive or discount" was to require OmniPlus to engage in "reasonable collection efforts," it could have said as much when it drafted the contract.  With its large legal team and host of experts on health care law and policy, ESI was certainly aware of the definition of that term and the discussion of waiver in the Medicare Provider Manual, and it could have chosen to use similar language in the contract with OmniPlus; but no definition or explanation is found in the document.[8]  Defendants' failure to put into the contract the language which they now seek to enforce must be construed against ESI as the drafter of the contract.  Ambiguities in the contract must be construed against the drafter and in accordance with the reasonable expectations of the parties.  *Keymer*, 169 F.3d at 505 ("if any ambiguity were to be found, [Defendant] drafted the Agreement and it cannot now claim the benefit of the doubt."); *Missouri Rental and Leasing, Inc. v. Walker*, 14 S.W.3d 638, 641 (Mo. App. E.D. 2000).  This is particularly true because not only did Defendants draft the contract, but because the contract is a contract of adhesion.  *See Manfredi v. Blue Cross and Blue Shield of Kansas City*, 340 S.W.3d 126, 132-33 & n.8 (Mo. banc 2011) (provider agreement between healthcare provider and insurer was a contract of adhesion in that it was a standardized form offered on a take-it-or-leave it basis and there was a large disparity in bargaining power between the parties); *Hartland Computer Leasing Corp. Inc. v. Insurance Man, Inc.*, 770 S.W.2d 525, 527 (Mo. App. E.D. 1989) ("the courts seek to enforce the reasonable expectations of the parties garnered not only from the words of a standardized

---

[8]  Additionally, the provisions of the Medicare Provider Manual and HIPAA which Defendants cite are completely inapposite to the situation in this case.  This case involves the construction of a particular contract between a pharmacy and a commercial PBM, and its interpretation is not governed by the language of these unrelated federal laws and regulations.

form imposed by its proponent, but from the totality of the circumstances surrounding the transaction").

    **4.**       **There is no evidence in the record that OmniPlus has ever waived copayments, and the only basis for Defendants' belief stems from the member statements, which are inadmissible hearsay.**

ESI's decision to terminate OmniPlus from its network was based on the unsubstantiated hearsay evidence of *four* patients out of thousands.  Hearsay evidence cannot be considered on a motion for summary judgment.  *Deptula v. Amacker, LLC*, No. 4:10-CV-1542-DDN, 2011 WL 3235714 at *2 (E.D. Mo. July 27, 2011).  Similar hearsay evidence was excluded in *AAMCO Transmissions, Inc. v. Baker*, when a franchisor visited one of its franchises and conducted a series of undercover shopping visits.  591 F. Supp. 2d 788, 792 (E.D. Penn. 2008).  Immediately as shoppers left the store, they were interviewed by the franchisor's investigation team and their interview was tape recorded.  *Id.*  Despite the near immediacy of the reports, they were inadmissible to show that the franchisor had justification for terminating the franchise agreement, because the court found unsworn customer interviews to be unreliable, inaccurate, and untrustworthy by their very nature.  *See id.*  at 794-95.  The member questionnaire responses in this case are even more unreliable.  They were not made immediately after each member's experience with OmniPlus, and OmniPlus has no way to verify their accuracy.  The member statements must be excluded or Defendants would have "the unfettered ability to present a one-sided version of events, which [OmniPlus] could not test."  *Id.* at 800.  *See also QVC, Inc. v. MJC America, Ltd.*, No. 08-3830, 2012 WL 33026, at *2, 4 (E.D. Pa. Jan. 6, 2012) (holding that several customer complaints were inadmissible because they were not made under oath, the witnesses were not subject to cross-examination, and the statements had not been verified, specifically noting that the offeror had not taken steps to verify the accuracy of the complaints).

Even if the hearsay evidence could be considered by the Court, the four member statements do not actually show a single copayment waiver or discount.  Member A reversed his prescription and never received the medication, so no copayment was due that could have been waived.  Doc. #111 at 8 (Defs. Memo in Support).  Member P simply indicated that she hadn't received a bill.  *Id.*  First, there is no evidence that the absence of a bill was deliberate so as to be evidence of an intentional waiver.  To the contrary, it is undisputed that it was OmniPlus's normal practice to include an invoice if the patient was unable to pay over the phone before the product was shipped.  Pl. Addt'l Facts ¶ 10.  Any dispute about this particular patient's receipt of an invoice is a dispute of fact improper for summary judgment.  Likewise, Members G and N simply reported to ESI that they had not yet paid their billed copayments.  *Id.*  None of these hearsay statements proves a waiver or discount.

Interestingly, ESI never undertook to gather more information from these four patients, or from other allegedly affected patients.  Pl. Addt'l Facts ¶ 18.  It certainly never undertook to gather information from OmniPlus about its suspicions, even after OmniPlus's request for a hearing on the merits of Defendants' assertion that it had participated in waiver or discounting of copayments.  *See* Pl. Addt'l Facts   ¶¶ 3, 4.  Instead, Defendants maintain that their right to terminate OmniPlus from the network sprung solely from "*any evidence or indication* that OmniPlus has waived or offered to waive copayments," regardless of whether such evidence was substantiated.  Doc. 111 at 16 (Defs. Memo in Support) (emphasis added).  The right to termination offered to Defendants in the contract is much more limited than this.  It only allows for immediate termination in a specified number of circumstances:[9]

---

[9]  This ostensible right to immediate termination is limited by the requirements of Texas law which are incorporated into the parties' contract and discussed in more depth in Section 1, *supra*.

PBM shall have the right to immediately terminate this Agreement upon written notice to Network Provider in the event that: (i) Network Provider ceases to be licensed by the appropriate licensing authority; (ii) Network Provider submits a fraudulent prescription drug claim or any information in support thereof; (iii) Network Provider is insolvent, goes into receivership or bankruptcy or any other action is taken on behalf of its creditors; (iv) Network Provider routinely fails to designate on its claims submission and/or supporting documents the information required by PBM or fails to comply with PBM's policies and procedures including, but not limited to, the Provider Manual and/or quality assurance and/or utilization review procedures; (v) any representation to PBM or any response to a question set forth on the Provider Certification is untrue or becomes untrue; (vi) there is a change in ownership or control of Network Provider without PBM's prior written consent; (vii) PBM determines that the Network Provider is dispensing Covered Medications in violation of any applicable law, rule and/or regulation; (viii) Network Provider is excluded from participating in any federal or state health care program; (ix) Network Provider fails to maintain insurance; (x) Network Provider breaches any of its representations and warranties set forth in this Agreement or any other document provided to PBM; (xi) Network Provider has not submitted a claim to PBM for ninety (90) calendar days; (xii) Network Provider (or any Pharmacy) fails to comply with any audit or investigative request, including the provision of information, made by PBM or any Sponsor or their designee, within the time period stated in such request; (xiii) a determination is made by PBM that Network Provider (or any Pharmacy) failed to document purchases of prescriptions drugs sufficient to support its claims for reimbursement to PBM; or (xiv) PBM determines that Network Provider's continued performance of services poses a risk to the health, welfare or safety of any Member.

Defs. Facts ¶ 9 (excerpt of Provider Manual).  Section 4.2.c of the Provider Agreement contains

all of the above, and also adds that immediate termination is possible if:

- "Provider fails to comply with the claims submission and processing requirements as set

  forth in Section 2.3 or fails to comply with Section 2.4 of this Agreement or any of ESI's

  policies and procedures including, but not limited to, the Provider Manual and/or quality

assurance and/or utilization review procedures."  Doc. #104-2 at 4.2.c(iv) (Provider

Agreement)); or

- Provider "no longer meets credentialing requirements." *Id.* at 4.2.c(v).

Notably, these circumstances for termination, specifically those on which Defendants rely in

their memorandum in support (¶ 4(iv), (v), & (x) and § 4.2.c(iv) & (v)) require that a contractual

violation actually has taken place; they do not allow Defendants to terminate the parties' contract

upon receipt of one or more unsubstantiated reports *suggesting* that a violation might have

occurred.[10]  Since Defendants continually rely on these hearsay statements as their justification

for OmniPlus's termination, they have no admissible evidence of actual waiver or of any actual

contract violation.

### 5.      OmniPlus has complied with all of its obligations under the contract, and particularly with those provisions cited by Defendants.

OmniPlus has complied with all of its obligations under the contract.  This is clear based

on a reading of the pertinent provisions of the contract in their full context, as set forth in

Sections 2 through 4, *supra*.   The following chart summarizes why each of the provisions

directly or impliedly relied on by Defendants fails to show any breach of contract that would

permit Defendants to terminate OmniPlus:

---

[10]  On page 4 of their memorandum in support, Defendants claim that the parties' contract is immediately terminable by Defendants if ESI "obtains a single statement *suggesting* that a provider, such as OmniPlus *may be* waiving or offering to waive copayments."  Doc. #111 at 4 (emphasis added).  According to the memorandum in support, this absurd statement is purportedly based on Section 2.2 of the Provider Manual which says that a provider may not institute "Member Copayment discount programs" and that it may be subject to termination if ESI "becomes aware of any Copayment or cost-sharing discounts" and gives as an example: "if [ESI] identifies fliers, advertisements, or other statements . . . that a Copayment will be a flat fee or will be discounted, capped, or waived."  Doc. #104-5 at 13 § 2.2.  There is no allegation here that OmniPlus had any such copayment discount program.

| Contract § | What it prohibits/allows | How OmniPlus complied |
|---|---|---|
| PM § 2.2 | OmniPlus must charge copayments and not change or waive them. | OmniPlus bills every patient for the copayment owed, sets up and maintains an account receivable for the amount due, and does not forgo collection of any copayments. Pl. Addt'l Facts ¶¶ 10-11. |
| PA § 2.4 | OmniPlus is prohibited from (a) charging copayments higher than the "Usual and Customary Retail Price amount" or the "applicable copayment indicated by ESI" to patients, (b) attempting to collect copayments from ESI, and (c) attempting to collet payment for medication from any other entity apart from the member and ESI. | OmniPlus learns the applicable copayment amount from ESI and charges the patient that amount.  OmniPlus does not attempt to collect any copayment amounts from ESI and does not attempt to collect further payment for medication from any other entity.  Pl. Addt'l Facts ¶¶ 7, 12, 20. |
| PA § 4.2(iv) | Termination allowed if OmniPlus no longer meets credentialing requirements. | OmniPlus fulfills all credentialing requirements through its compliance with the credentialing process and the parties' contract. Pl. Addt'l Facts ¶¶ 7, 13-17. |
| PM § 4(v) | Termination allowed if any representation on the Provider Certification is untrue or becomes untrue. | OmniPlus did not waive or discount copayments, and ESI has not shown that it did, so OmniPlus's representation on the Provider Certification has at all times been true.  Pl. Addt'l Facts ¶¶ 7, 13, 14. |
| PM § 4(x) | Termination allowed if OmniPlus breaches warranties or representations of the agreement. | By its charging of copayments and maintenance of accounts receivable, its collection of a portion copayments, its refrain from attempting to collect copayments from ESI, and its refusal to waive or discount copayments, OmniPlus has fulfilled all warranties and representations assigned to it under the contract.  Pl. Addt'l Facts ¶¶ 7-13. |
| PM § 2.2 | OmniPlus may be subject to termination if ESI becomes aware of a copayment discount program through fliers, advertisements, or statements of OmniPlus. | OmniPlus does not have a copayment discount program and does not distribute fliers, advertisements, or statements offering a discount or waiver of copayments; Defendants have made no contention otherwise.  Pl. Addt'l Facts ¶ 17. |
| PA §§ 3.1(a), 2.3. PM §§ 5.1, 5.3 | OmniPlus may be subject to recoupment and/or termination if it submits claims improperly or if it fails to comply with an audit or a request for information. | Pl. has at all times been in compliance with the submission requirements of the contract, and has never failed or refused to provide requested information to ESI; Defendants have made no contention otherwise. Pl. Addt'l Facts  ¶ 16; Doc. #118-2 at 1-2 ¶¶ 4-7 (Dec. of Breimeister). |

21

Without citation to any particular contract provision, Defendants also allude to the possibility of artificial inflation of drug prices (Doc. #111, p. 5). Perhaps Defendants hope that this may somehow provide an alternative justification for OmniPlus's termination.  However, it is undisputed that OmniPlus does not and has not ever set the reimbursement prices paid to it by ESI; those prices are set by ESI and its clients.  Pl. Addt'l Facts ¶ 19; Doc. #104-5 at 13 § 2.2 (excerpt of Provider Manual)).  It is disingenuous for Defendants to focus on this point given that it was Defendants who adjudicated each prescription and set the reimbursement prices to be paid to OmniPlus and, therefore, neither OmniPlus nor other in-network pharmacies had any ability to increase the prices.  *See, e.g., id.*; Ex. 2 to Pl. Addt'l Facts at 119 (excerpt of 30(b)(6) Depo.)).  Additionally, there is no evidence that a single price on a single prescription was too high, nor that there has been any allegation of a breach of contract or wrongful conduct on the part of OmniPlus regarding reimbursement prices.

## CONCLUSION

The undisputed facts and specific contract provisions demonstrate that OmniPlus complied with its contractual obligations and Defendants did not.  Defendants' termination of OmniPlus from the network based on an alleged breach of obligations was therefore wrongful under the contract and the Texas law incorporated into the contract.  For these reasons, and for all the reasons discussed above, Defendants' motion for summary judgment on the merits of Plaintiff's claims should be denied.

22

Respectfully submitted,

SHANDS, ELBERT, GIANOULAKIS &
GILJUM, LLP

*/s/ Douglas W. King*
Douglas W. King 34242 MO
Erin M. Leach 66924 MO
1 North Brentwood Blvd., Suite 800
St. Louis, MO 63105
(314) 241-3963
(314) 241-2509 – Fax
dking@shandselbert.com
eleach@shandselbert.com

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of January, 2016, a copy of the foregoing was filed with the Court to be served electronically by operation of the Court's CM/ECF system on all counsel of record.

*/s/ Douglas W. King*

23